## SULLIVAN et al. v. O'BRIEN.
### No. 9544.

Court of Civil Appeals of Texas. San Antonio.

Aug. 14, 1935.

Rehearing Denied Sept. 18, 1935.

Templeton, Brooks, Napier & Brown, VanderHoeven & Greathouse, and T. J. Newton, all of San Antonio, for appellants.

Dave Watson and Boyle, Wheeler, Gresham & Terrell, all of San Antonio, for appellee.

SMITH, Chief Justice.

This action, for $200,000 actual and $200,000 exemplary damages, was brought by Paul O'Brien against John C. Sullivan and Dan J. Sullivan, who are alleged to

have conspired with their father, D. Sullivan, and their brother W. C. Sullivan (both deceased), to wrongfully and maliciously prosecute Paul O'Brien, without probable cause, for the offenses of theft, theft by bailee, embezzlement, and forgery. The complaint is based upon a series of acts alleged to have been committed by one or more of the Sullivans over a period of years beginning in 1921, and terminating, in 1932, with the dismissal of the last of a series of indictments which had been returned against O'Brien. The record and the briefs of the parties are quite too voluminous to be encompassed in any concise summary, and none will be attempted here.

The private banking house of D. Sullivan & Co., while purportedly operated as a partnership composed of Dan Sullivan, Sr., and his son, W. C. Sullivan, was in fact owned solely by the former, who established the business in 1882 or 1883, and successfully operated it up to the time of his death, 50 years later, at the age of 88. The record at large shows that he completely dominated and controlled the business and its operations, and ruled its personnel with an iron, no less than cunning, hand. The said Dan Sullivan, Sr., will be hereinafter referred to as D. Sullivan, or Sullivan, to avoid confusion with his son, Dan J. Sullivan, who will be referred to as D. J. Sullivan.

The record at large further shows that for more than 30 years, from the time they were mere boys, and until July 16, 1921, when they left that service, the twin brothers, Peter and Paul O'Brien, were trusted employees in the bank. They began work as messengers, at a salary of $40 per month, which was gradually increased, as they were promoted in rank and responsibility, until in 1916, when it had reached $190 and in 1921, when it was $250, per month, each. For many years prior to their discharge in 1921, the two brothers were in charge of the books of the bank, and themselves actually kept the "control books"; that is, the general ledger, loans, and discounts ledger, and cashbook. The record forcefully shows that throughout their service in the bank (as well as in all the affairs of their lives), and in all the details of the transactions involved in this litigation, Peter and Paul O'Brien acted in complete union and harmony, as twin brothers in deed as well as in fact, so that the acts of each were the acts of the other,

even to the bringing of identical suits, Paul's being now under consideration here, and Peter's, apparently, still in the trial court.

Some time in June, 1921, D. Sullivan became suspicious of the conduct and motives of the O'Briens, and on July 16th summarily discharged them from the bank's service.

Shortly afterwards, on August 6, Sullivan instituted two actions, in trespass to try title, against the O'Briens and their wives, and certain corporations owned by them, to recover title and possession of valuable business and other properties situated in and out of the city of San Antonio, in Bexar county, titles to most of which properties were in corporations owned by the O'Briens, or in their wives.

Six days later, on August 12, Sullivan and the O'Briens entered into a tentative compromise of those two suits, whereby the O'Briens agreed to pay Sullivan a million dollars in satisfaction of the latter's claim. On August 21 this agreement was restated, whereby the O'Briens agreed to pay Sullivan $250,000 in cash and convey to him real property of an appraised value of $750,000. This agreement was consummated, and covered into a final judgment, on September 9, 1921.

At the ensuing October term of the Forty-Fifth district court of Bexar county, the grand jury returned 161 felony indictments against Paul, and 163 against Peter, O'Brien, charging them with the offenses of theft, theft by bailee, and embezzlement, of sums aggregating nearly three million dollars, alleged to have been the property of D. Sullivan & Co., described in the indictment as a partnership composed of D. and W. C. Sullivan. Appellee, Paul O'Brien, was tried upon one of those indictments in January, 1922, and was acquitted by a jury in response to a peremptory instruction from the trial judge, not upon the merits, but upon the ground that D. Sullivan & Co. had not been shown to be a partnership, as alleged in the indictment. Later in the year the remaining indictments against both O'Briens, embracing the same faulty allegation, were transferred to the Thirty-Seventh district court, and there, on September 28, 1922, finally dismissed, upon motion of the district attorney.

Several succeeding grand juries considered the transactions, without returning any indictments thereon, but 8 months

later, at the May, 1923, term of the Thirty-Seventh district court, the grand jury returned 33 new indictments against each of the O'Briens, charging them with the offenses of theft, theft by bailee, embezzlement, and forgery. These indictments were based upon an equal number of transactions identical with a like number covered by the previous indictments, which had been dismissed. The new indictments embraced omnibus allegations of ownership of the funds alleged to have been taken, to meet the defect upon which the prior indictments had been dismissed, and upon which Paul O'Brien had been acquitted in January, 1922. In 1925 Peter O'Brien was tried and acquitted upon one of the 33 indictments against him, but the 33 indictments against Paul O'Brien lay dormant until in June, 1926, when he was tried upon one of them and acquitted by a jury upon the merits.

Then, in October following, the remaining indictments against both O'Briens were dismissed by a special judge, upon motion of the defendants therein, but, in a mandamus proceeding prosecuted by the acting district attorney and private counsel assisting him, the Supreme Court of Texas ordered the regular judge to reinstate the cases upon the docket; they having been illegally dismissed upon the procurement of the accused. State v. Anderson et al., 119 Tex. 110, 26 S.W.(2d) 174, 69 A. L. R. 233.

Finally, however, on November 28, 1932, after the death of D. and W. C. Sullivan, and upon motion of the district attorney, the remaining indictments, previously reinstated upon mandate of the Supreme Court, were dismissed, and the prosecution thereon ended.

Thereafter, in July, 1933, Paul O'Brien instituted this suit, and Peter filed a like action. Paul's suit was tried, and the judgment therein is the subject of this appeal. Upon the trial in this suit the jury found, in response to special issues submitted to them, that the alleged conspiracy was entered into by the four Sullivans to maliciously prosecute O'Brien, without probable cause; that John C. and D. J. Sullivan, "either at the beginning or at" some "time during its existence, entered into said conspiracy," and "aided in carrying out its purpose by acts, deeds, counsel or advice"; that the criminal charges embraced in all the indictments against O'Brien were false; that, as a direct result of the criminal

prosecutions against him, O'Brien sustained actual damages in the sum of $100,000, and exemplary damages in the sum of $80,000. From an adverse judgment, based upon those findings, John C. and D. J. Sullivan have brought this appeal.

At the outset it is deemed appropriate to state that the record at large shows that over a period of 5 or 6 years prior to their discharge the O'Briens took large sums of money, almost daily, from the bank; some of it in sums of as much as $10,000 in currency, some of it in sums of as much as $6,000, by slips crediting their individual accounts carried under fictitious names; some of it in certified checks purchased for the O'Briens, by friends selected by them, with funds of the bank. Sullivan charged that these withdrawals aggregated nearly $3,000,000, while appellee contends that the amount did not exceed $800,000, but admits it aggregated that sum. Sullivan contended, and appellee denies, that the O'Briens embezzled those funds. Appellee contends, and Sullivan denied, that the withdrawals were made by the O'Briens with Sullivan's knowledge and active connivance. These underlying facts and contentions call for findings of fact in regrettable detail as a basis for this opinion and decision.

In the earlier operations of the institution, D. Sullivan resorted to the practice of "scattering" cash assets of the bank among numerous accounts carried under fictitious names. About 1910 he combined the larger of those accounts into one, which was thenceforth carried under the name of "E. S. Clem," a fictitious person, so far as the bank was concerned. In that account collections of both principal and interest were deposited from the larger loans made by the bank, and from it new loans were made. Outgoing and incoming transactions were evidenced, not by the usual method of checks, or drafts, and deposit slips, but by simple charge and credit slips. By these devices the funds in the account were made to appear as individual deposits of the fictional Clem, and therefore liabilities of the bank; whereas they should have been allocated as surplus, or undivided profits, and therefore assets of the bank. The object of the subterfuges, according to appellee, was to evade state and local taxation. All these subterfuges, as well as the purpose of them, were known to the O'Briens, who took charge of the "control books" of the bank about the time the Clem account was

created. The record of this account was carried in the "individual deposit" ledger, which was kept by Bookkeeper Hogan, until in 1919, when the O'Briens, under D. Sullivan's direction, cut out of that ledger all the leaves upon which that account was evidenced, and thereby destroyed all trace of the account from the official books of the bank. According to appellee, the purpose of this emasculation was to conceal the account from a federal income tax inspector, then in the offing. Thereafter the account was carried in a private memorandum, made, and kept in their private desks, by the O'Briens. The bank's books were made to balance daily by the simple device of the O'Briens' passing the amount of the balance in the Clem account, by word of mouth, to Bookkeeper Hogan, who added the sum to his total individual deposits balance. This Clem account is important in this inquiry, as will be seen.

To resume the history of the background of the case, then, we advert to appellee's theory, resting alone upon his individual testimony, concerning the surreptitious withdrawals from the bank, out of which the O'Briens admittedly received as much as $800,000. In 1916, according to appellee's theory, D. Sullivan came to the O'Briens, at their desks in the bank, and, without any previous intimation of his purpose, told them that he was "going to have a new arrangement"; that "we have got to keep these big figures out"—meaning the large Clem account; that "we have got to have a new arrangement. We will have a partnership. Myself and you two. And I will advance you some money from time to time and you make investments on the outside, and then when it is closed up I'll get my interest and you will make some profit out of it, too;" that they would not keep a set of books—"got too many books now. Just keep a memorandum"; that Sullivan then picked up a small envelope from among the papers in a wastebasket at their feet, and told the O'Briens to "keep everything on it, on this; and I will keep track of it"; that the O'Briens did keep the account on that envelope for a short time, and then carried it on a "big sheet of paper," and Sullivan kept a like account on a memorandum of his own; that about once a month the O'Briens and Sullivan compared the two memoranda and in that way kept them in agreement.

Appellee testified further that Sullivan, at the time, presented to them a memorandum, in his own handwriting, of the partnership agreement as thus stated, which they signed and Sullivan put in his pocket, there being no copy. By these simple informalities, the partnership was effected, and was not thereafter enlarged, in any detail, even as to the amounts to be advanced, the rate of interest to be paid Sullivan, or as to how, or when, or by what processes settlements or accountings were to be made by the O'Briens. Sullivan simply told the O'Briens that the three were to be partners, he to furnish moneys, they to invest and take profit, and he to "have his interest." The partnership operations were initiated promptly by Sullivan calling one of the O'Briens into his private office and handing him $10,000 in currency, and in a few days handing the other, in like manner, $6,000 in currency, and so on, almost daily, Sullivan called his new and secret partners into his private office and slipped them currency in packages of from $4,000 to $10,000. These transactions were manipulated upon the books of the bank by the simple process of entering the charge in the cashbook, which was kept by the O'Briens, and disappeared with their discharge, and charging the amounts against the daily balances of the Clem account, entered in the handwriting of the O'Briens upon a private (so far as the bank, as such, was concerned) memorandum of that account, which was retained in the exclusive possession of the O'Briens, at least so far as the other employees of the bank were concerned. This private memorandum, the sole evidence of the Clem account after the disappearance of the cashbooks, was not produced upon the trial of this case. Appellee testified that it was left in the O'Briens' desk when they were discharged from the bank, and that when they looked there for it at a later day it was missing. It is admitted by appellee, however, that the day following their discharge the O'Briens privately advised Bookkeepers Hogan and Courtney, for their information in striking the daily balance, of the amount of the balance in the Clem account.

As stated, the testimony of appellee was that Sullivan's object in these machinations was to "get those big figures out of the bank," meaning, according to the same authority, the Clem account, which seems to have been the victim of every malevolent intrigue of the three conspirators. Well, Sullivan must have been gratified

with the first 2 years of this assault upon that account, for, in 1918, in order to hide them from tax gatherers, he transferred numerous smaller fictitious accounts into the Clem account. That device must have made the account again unwieldy, in spite of the sustained daily inroads upon it by the partnership, for, in 1920, according to appellee's testimony, Sullivan "came along one day and said, 'that Clem account is not being reduced rapidly enough, we have got to make a daily charge against it,'" and "we have got to wipe the Clem account out of the books." The idea seemed to intrigue the O'Briens, for they joined Sullivan in a scheme, called in the record "raising" the amount of daily withdrawals from the bank, as follows: Each day at the close of business, as was the custom, a clerk would lay on appellee's desk an "adding machine list" showing the amounts, only, of withdrawals by checks on that day; Sullivan would then come along to appellee's desk and add, in pencil, to the machine made list, figures showing amounts to be withdrawn that day by the O'Briens, those amounts ranging from $2,000 to $4,000. Appellee would then enter these amounts into the bank's current cashbook, kept by him, "indicating," according to his testimony, "that that amount of money had been withdrawn in some form or other from the bank"; whereupon he would "deduct" the amount "from the balance of the Clem account that was being carried on my memorandum," thus reducing the balance in the ill-fated account that much. The transaction would be completed, then, by crediting the amount to one of the fictitious accounts owned by the O'Briens. By this process the assets of the bank were daily lost, and the O'Briens' accounts therein were daily increased, in amounts ranging from $2,000 to $4,000, until in June, 1921, when Sullivan, becoming suspicious, "dissolved" the partnership, and on July 16 discharged the O'Briens from the bank. By this time the amazing sum of approximately $1,500,000 had been credited into the O'Briens' various accounts in the bank, with a balance on hand in excess of $350,000. What portion, if any, of the daily withdrawals in cash was passed through those accounts is not apparent from the record. It is admitted by appellee that the funds taken by them out of the Clem acocunt were mingled, indiscriminately, with those in their own accounts, but it was explained that they kept "track" of those withdrawals by occasionally comparing their secret memoranda of the transactions with like secret memoranda retained by Sullivan.

■ Appellee explained, to the satisfaction of the jury, how the O'Briens disposed of the vast sums passing through their accounts, under the direction, according to appellee's testimony, of D. Sullivan. For example, appellee testified that, in order that they "would not have so much real money around," they would pass out checks and currency to selected close personal friends and have the latter purchase, in the O'Briens' names, from other banks, cashier's checks for large sums, and the O'Briens would hold those checks. At one time it appears they had such checks for the aggregate amount of $330,000, one of them being for $100,000 upon a Houston bank, another for $146,000 upon a San Antonio bank. The O'Briens invested the funds, variously. One of them, Peter, built and equipped a home for something like $125,000, and appellee acquired one for $60,000 or $75,000; titles being taken in the names of the owners' respective wives. Peter's palatial mansion was exploited in local newspapers, with his apparent consent, as being built by "Mrs. Lottie O'Brien, of New York." They also purchased numerous valuable business properties in San Antonio, among them being the Travelers Hotel, of the agreed value of $240,000; Princess Theatre, $310,000; Wicks building, $100,000; Mayor building, $90,000—aggregating a total value of $840,000. The O'Briens' ownership of the titles to these properties was concealed in "dummy" corporations, owned by them. According to the testimony of appellee, by which this court is bound, these devices for concealing the O'Briens' ownership of the cashier's checks and the real poroperties were resorted to at the instance of D. Sullivan.

About the middle of June, 1921, D. Sullivan became dissatisfied with the partnership arrangement of the O'Briens, and set up inquiries into their dealings, including the employment of the firm of W. M. Aikman & Co., certified public accountants, to audit the affairs of the bank, but, pending the actual work of the auditors, upon other information procured in the meantime, Sullivan, on July 16, discharged the O'Briens. In a few days the auditors went to work on the books, but in the meantime an examination and report of the remaining bookkeepers in the bank disclosed,

among other irregularities, that the "cash books" of the bank for the 10 years preceding the current year, and which had been kept by the O'Briens, and which disclosed the O'Briens' manipulations, were missing and could not be found; that more than 100 leaves from individual ledgers, running back to 1916, were missing; that an item appearing in the individual balance ledger of date June 20, 1918, had been raised by one of the O'Briens from $100,000 to $600,000. The salvaged current cashbook showed that during the first 6 months of the year the O'Briens had gotten nearly $400,000 of the bank's funds by "raising" the amounts of daily withdrawals, charging them to the Clem account, and crediting them to their own fictitious accounts, all in the handwriting of the O'Briens. These facts were evidenced by affidavits made on July 23 by the bookkeepers assuming charge of the books after the O'Briens left, on July 16. The inquiry extended into the deed records of Bexar county and other sources of information, which uncovered the O'Briens' ownership of vast real estate holdings. Sullivan called in the O'Briens and demanded that they convey all such holdings to him, but they refused, whereupon, on August 6, Sullivan brought the civil suits against the O'Briens, heretofore described, to recover all said properties, as a result of which, 6 days later, the O'Briens agreed to settle with Sullivan by paying him a million dollars.

In the meantime Aikman and his assistants had been delving into the books of the bank, although hampered and delayed by the disappearance of some of the books, and emasculation of others. And, as stated, when this audit was suspended by the settlement of the civil suits, an actual shortage of $1,700,000 and an estimated additional shortage of $300,000 had been uncovered. (Subsequent audits, made, respectively, by a Houston firm of auditors and the income tax division of the Federal Treasury Department, and running further back into the life of the bank, disclosed shortages in excess of $2,000,000.)

The disclosures made in the Aikman audit and in the investigation and reports of the bank's bookkeepers were made the basis of the 161 indictments against appellee, and 163 indictments against his brother, Peter, returned at the ensuing October, 1921, term of the grand jury, which, being dismissed in 1922, were followed by the 33 indictments returned against each of the O'Briens in 1923, based upon a like number of the transactions covered by the 1921 indictments. The 1921 indictments covered specific defalcations aggregating nearly $3,000,000, while the 1923 indictments embraced defalcations aggregating less than $100,000.

Now, the foregoing history of the case, long and tedious as it undoubtedly is, has been deemed essential to a proper and orderly disposition of the appeal. The statement of the case has not been made with any intention of passing upon the guilt or innocence of the O'Briens with reference to the criminal offenses for which they were prosecuted. The determination of that question is not within the province of this court; it was settled in favor of the two O'Briens by the juries which tried each of them in trials upon the merits of one indictment, and in favor of appellee in the trial of this case. So far as this court is concerned, then, the O'Briens, or, specifically, appellee, was not guilty of the offenses for which he was prosecuted. The foregoing statement is made, rather, with reference to the question of probable cause, as affecting appellants in their attitude towards the prosecutions of the O'Briens.

Nor is this court concerned with the question of whether D. Sullivan, or even W. C. Sullivan, was guilty of maliciously prosecuting the O'Briens, without probable cause. The O'Briens' whole defense in the criminal cases, and appellee's whole cause of action here, rests upon his unsupported testimony that all his acts of falsifying, manipulating, concealing, and emasculating the books and records of the bank, all his surreptitious withdrawals and appropriations of the bank's funds, all the subterfuges employed by him in covering up his transactions and hiding those funds under fictitious names and titles, were resorted to by him with the consent and under the direction of D. Sullivan, the true and ultimate owner of those funds; wherefore, he contends, he was not guilty of that character of defalcation calling for criminal prosecution. In short, he contends, and must rest his case upon that contention, that D. Sullivan gave his own funds to appellee, to "invest on the outside," Sullivan to "have his interest" on the funds, and appellee to have the "profits" from the investments. The contention is extended to the conclusion that Sullivan,

knowing and participating in the transactions, knew also that appellee did not embezzle those funds, and, concealing the true facts, procured the prosecution of appellee as if he had in fact embezzled; wherefore the prosecution was false and malicious, and without probable cause. The jury found these contentions to be true as to D. Sullivan, and this court is bound by that finding, because it is supported by the individual testimony of appellee, although not otherwise. We do not pass upon the sufficiency of the testimony, in that respect, as to W. C. Sullivan, for he, as well as D. Sullivan, died before this suit was brought, and therefore could not testify upon the trial. It should be added that fragments of their testimony were brought forward from the records of the criminal trials, but, being adverse to appellee's testimony, cannot be given effect here.

These observations lead to the crux of this appeal, and to a consideration of the controlling questions, of whether appellants, J. C. Sullivan and D. J. Sullivan, participated, by overt acts, in the prosecutions of appellee, and whether such participation was malicious, and without probable cause. And, first, as to the question of the alleged participation of appellants in said prosecutions.

We are of the opinion that there was no evidence that appellant D. J. Sullivan participated in those prosecutions. He was not consulted by any of the prosecuting officers or attorneys, nor did he ever have any communications with them before or during the prosecutions. He never appeared before any of the grand juries which investigated or indicted the O'Briens. He was a witness in the criminal trial of appellee in 1922, not voluntarily but under subpoena, and it is not claimed by appellee that any of his testimony then given was false in any particular or degree. He was not questioned by the auditors in their examination of the bank's books, upon which the indictments were returned, nor is it claimed that he furnished, or offered to furnish, those auditors any information. It is inferable from the record that, as he had nothing to do with the making, or keeping, or supervising of the books of the bank, he could supply no information of value in those examinations.

Appellee, in support of his contention that D. J. Sullivan participated in the prosecutions, cites several incidents which, it is claimed, connected the latter with those prosecutions. It is pointed out, for example, that during one of the criminal trials of appellee or his brother various employees of the bank were subpoenaed as witnesses in the case; that before or as the employees left the bank to testify they were assembled in the private office of D. Sullivan, where the latter and D. J. Sullivan were sitting, and there ensued some sort of conversations, in which, however, it is not shown that D. J. Sullivan participated. Appellee has summoned this incident as evidence that D. J. Sullivan conspired with D. and W. C. Sullivan in instituting and prosecuting the criminal indictments against appellee. It would seem to be perfectly obvious that this incident is of no possible value in determining D. J. Sullivan's participation in those prosecutions. It is not contended that on that occasion D. or D. J. Sullivan coached the witnesses, or even discussed their probable testimony, or that D. J. Sullivan in any way participated in any of those conversations, whatever they were. All of those witnesses did thereafter testify in the criminal trials, and there is no contention that any of their testimony was false; and most, if not all, of them, testified in the trial of this cause, some of them, at least, as witnesses for appellee, and it is not contended that any of them, even D. J. Sullivan, testified falsely to any material fact in the case, or that they were in any way influenced or coached by the Sullivans, or that the latter suggested or asked what their testimony would be. It is quite obvious that this incident is of no value in this inquiry. The other incidents brought forward by appellee in this connection are of no more probative force than the one cited above. At most, that character of evidence raises no more than mere surmise or suspicion of the fact sought to be established by them. Actions for damages for malicious prosecution are not favored in the law, and require more satisfactory proof than is required in ordinary lawsuits; and certainly recovery in such cases cannot be had upon mere surmise and suspicion. Newell, Mal. Pros. 21; 18 R. C. L. p. 11, § 2; 12 C. J. p. 640; Reed v. Lindley (Tex. Civ. App.) 240 S. W. 348; American Motors Finance Co. v. Cleckler (Tex. Civ. App.) 28 S.W.(2d) 274; Genovese v. Harlingen Piggly Wiggly Co. (Tex. Civ. App.) 32 S.W.(2d) 379, and authorities there cited.

It must be so, as a matter of course, that appellants, D. J. and J. C. Sullivan, knew of the prosecutions against the O'Briens. It may be assumed, even—although the fact does not appear to be established in the record—that appellants knew of D. & W. C. Sullivan's activities in those prosecutions, and acquiesced therein. But those facts do not establish liability against appellants for those prosecutions, because mere knowledge, acquiescence or consent to such acts of another are not sufficient to render one liable in such cases. 38 C. J. p. 395, § 23; Newell, Mal. Pros. p. 393.

It is the opinion of this court, therefore, that there was no evidence in the record that D. J. Sullivan participated in the prosecutions against appellee in such manner as to render him liable for damages for those prosecutions. On the other hand, we are of the opinion that the evidence raised the issue of J. C. Sullivan's participation in the prosecutions, and the jury's finding against him thereon is therefore binding upon this court.

We come, then, to the question of probable cause. J. C. Sullivan had no more relation with the bank than that he was the son of D. Sullivan, and attorney for the institution, with offices up stairs in the same building, a two-story structure. There is no contention that he had anything to do with the operations, or knowledge of the books, of the bank. The record shows that he had suffered the misfortune of losing his sense of hearing, which prohibited others from communicating with him, except in writing. His representation of the bank seemed to be somewhat perfunctory and routine, for which he was paid a retainer of $200 per month. Other attorneys represented the bank in larger affairs, or at least in litigation, which, naturally, he could not conduct because of his infirmity. For example, the civil suits heretofore mentioned were brought by another firm of lawyers in behalf of the bank, apparently without J. C. Sullivan's knowledge that such suits were contemplated.

On the other hand, appellant D. J. Sullivan was employed in the bank as a paying and receiving teller. He came to the bank 6 years after the O'Briens entered that service. In addition to his duties at his window, he met customers asking for his father, and passed, more or less, upon their eligibility for the privilege sought. Sometimes he would turn them away, or admit them, upon his own motion; sometimes have them wait until he consulted his father, before admitting or turning them away. It further appears that he signed some of the checks of the bank or "vised" checks against his father's personal account. But there is no intimation in the record that he was ever concerned, in the least degree, with the making, keeping, inspecting, or checking of any of the books of the bank, unless it be that he was shown to have "O. K.'d" some of the manifold charges and credits in the omnibus Clem account, although it is obvious that this approval did not include the charges, made after banking hours by the O'Briens themselves, covering the secret transactions between them and D. Sullivan. The record seems to show that D. J. Sullivan somewhat resented the superiority of the O'Briens' rank or power in the bank, or the apparently superior confidence his father seemed to place in the O'Briens, whose salaries were the same as his, $250 per month. He was shown to have once made a sneering remark about his father "doing so much business" with the O'Briens, and, since it is quite obvious from the record that he knew nothing of the alleged partnership between them and his father, his remark may have had reference to two real estate deals, involving $50,000 or $60,000, openly made between his father and the O'Briens.

There can be no serious contention, under any aspect or implication of the record, that either J. C. or D. J. Sullivan had any knowledge, or even suspicion, of the alleged partnership between their father and the O'Briens. The whole theory of appellee was that that partnership arrangement was secret, and D. Sullivan, the other party thereto, bitterly denied, to his dying day, that such partnership ever existed. It certainly was formed in secret, without scratch of pen that ever came to light. The bundles of abstracted currency were surreptitiously passed to the O'Briens by D. Sullivan in the latter's private office—inferentially out of his individual safe kept in that office—and secretly charged by the O'Briens upon their privately kept memorandum of the Clem account kept in their private desk, and in the cashbooks kept by them which disap-

peared at the time of their discharge. The daily balances were secretly raised, after the close of the day's business, by the O'Briens, from penciled notations made by D. Sullivan upon Bookkeeper Hogan's balance of daily withdrawals, and secretly credited by the O'Briens to their fast growing fictitious accounts. The cashier's checks were purchased for the O'Briens, from other banks, by outsiders, who were selected by the O'Briens for that purpose. All the records and manipulation, emasculation, and concealment of the records, of these transactions, were secretly made by the O'Briens. The O'Briens kept the secret of the partnership locked within their breasts for 4 years after their discharge from the bank. They did not set it up as a defense to the civil suits against them, which they promptly settled by disgorging a million dollars, without complaint or any intimation of the alleged partnership transactions. When confronted, by the auditors, with their manipulation, concealment, and emasculation of the books of the bank and asked for an explanation thereof, they failed to set up their subsequently asserted claim of partnership, and they preserved a like silence when so confronted by Sullivan's attorney in the civil suits. So did they withhold that defense, or explanation, from the bishop of their church when the latter besought them to make peace in the controversy with Sullivan. They were repeatedly given opportunity to make that defense in habeas corpus proceedings and before grand juries, but refrained under a claim of immunity. They kept the secret against all the world until Peter O'Brien disclosed it in one of the criminal trials in 1925, 4 years after the transactions were closed, during which they stood accused, in civil and criminal courts, of embezzling the very funds they now claim to have lawfully acquired by virtue of the alleged partnership. So far as that is concerned, it does not appear from the record, or at least the fact has not come to our notice in our investigation of the record, that appellee ever did testify in any case, criminal or civil, in explanation or defense of the charges against him, until he testified in the trial of this case, more than 12 years after the charges were made. On the other hand, his brother, Peter, alone, testified in the criminal trials to the defense here set up, but did not go on the witness stand in this case, although apparently present through the trial here-of. The entire record shows, conclusively that neither appellants, nor any others, knew of the existence of the partnership, nor of the O'Briens' claim thereof.

What, then, was the evidence upon which J. C. and D. J. Sullivan, sons of D. Sullivan, acted at the beginning and during the course of the prosecutions against the O'Briens? Assuming, for the purpose of this discussion, that they joined in initiating and pressing those prosecutions, did they have probable cause for believing the O'Briens guilty of the offenses for which they were prosecuted?

Under the facts hereinabove summarized, as well as many other facts and circumstances of record pointing in detail to the apparent guilt of appellee and his brother, we hold that appellants had probable cause, as a matter of law, for prosecuting appellees for the offenses for which they were indicted, whether or not they actively participated, or conspired with their father and brother, in those prosecutions. Under those facts, unexplained and undefended, as they were at the time, it would have been the duty, certainly the lawful privilege, of any and every citizen to prosecute the apparent offenders. And certainly appellants would have been justified in such prosecutions, regardless of, and after knowledge of, the belated claim of the O'Briens that they got the bank's funds by virtue of a secret and collusive partnership with appellants' father. For appellants were confronted with the sudden disclosure that the O'Briens, $250 a month clerks, having the custody, control, and keeping of the control books of the bank, had secretly amassed nearly $2,000,000 in money hidden in cashier's checks and in fictitious accounts in the bank, and in real estate, their ownership of which they had concealed under the names of other persons or "dummy" corporations; that those clerks had suddenly acquired homes of the value of $125,000 and $75,000, respectively, with the titles hidden in the names of their wives; that those clerks had taken hundreds of thousands of dollars of the bank's money, in currency, and in credits to their individual accounts and fictitious accounts owned by them, and had covered up the transactions by manipulation of the books, including the unexplained "raising" of one balance from $100,000 to $600,000. Appellants were confronted with their father's insistence that the O'Briens had em-

bezzled those funds without his knowledge or consent, and this attitude of their father was confirmed when he brought the civil suits against the O'Briens, and further confirmed by their action in promptly, and without defense or explanation, disgorging a million dollars to appellants' father in settlement of those suits. D. Sullivan gave this reason to his sons for agreeing to that settlement: "In accepting a million I did not recognize that the money over and above a million legally belonged to O'Brien. I knew they stole 706,000 more according to Aikman report, but did not know where the 706,000 was and knew of no legal steps whereby I would get it. Hence I made the settlement rather than have a doubtful lawsuit." The fact that 4 years later Peter O'Brien, in one of the criminal trials, set up, for the first time, the defense that they took the bank's funds, at least to the admitted extent of $800,000, by virtue of their then claimed clandestine partnership with D. Sullivan, cannot be given the effect of removing the probable cause which, as a matter of law, warranted appellants in prosecuting appellee and his brother. This court so holds.

We are confronted with the question of limitation, urged by appellants here, as well as below, and it is deemed proper to decide that question. Under the appropriate statute, "actions for malicious prosecution" must be "commenced and prosecuted within one year after the cause of action shall have accrued, and not afterward." Article 5524, R. S. 1925.

■ A cause of action for malicious prosecution cannot accrue until the prosecution complained of has terminated favorably to the person prosecuted. 28 Tex. Jur. pp. 454, 480, §§ 7, 21; Shoemaker v. McElwaine (Tex. Civ. App.) 59 S.W.(2d) 440, and authorities there cited.

There is some confusion of authority upon the question of what is a termination of a prosecution upon which actions of this character may be based. It is often said that a prosecution is so terminated when it is disposed of in such manner "that it cannot be revived." Cooley on Torts (3d Ed.) §§ 215, 216; 28 Tex. Jur. p. 455, § 7; Von Koehring v. Witte, 15 Tex. Civ. App. 646, 40 S. W. 63 (writ ref.); Casebeer v. Drahoble, 13 Neb. 465, 14 N. W. 397; Casebeer v. Rice, 18 Neb. 203, 24 N. W. 693. Or, by "acquittal, or in some manner equivalent thereto." Note, 69 A.

L. R. 1062; Von Koehring v. Witte, supra. Undoubtedly, however, these definitions call for, or at least admit of, further construction, or qualification. For it seems well settled that the termination contemplated does not mean the end of the purpose or intention to prosecute, or a final adjudication of the accused person's guilt or innocence, but means, rather, the termination of the particular prosecution, or proceeding, complained of, so that, if the prosecutor intends to proceed further in his purpose, he must institute proceedings de novo, or, as sometimes said, is "put to a new proceeding." Cooley on Torts (3d Ed.) § 16; Newell on Malicious Prosecution, p. 343, § 12; 14 A. & E. Law 29, 30; 18 R. C. L. p. 21 et seq.; annotations in 39 L. R. A. (N. S.) 1215, 2 L. R. A. (N. S.) 927.

■ There is also this exception, that a dismissal of a prosecution brought about by the procurement or compromise of the person therein accused is not such an end of the prosecution as will warrant an action of damages for malicious prosecution. Cooley on Torts, §§ 215, 216; Rogers v. Mullins, 26 Tex. Civ. App. 250, 63 S. W. 897; note, 2 L. R. A. (N. S.) 945; Halberstadt v. New York Life Ins. Co., 194 N. Y. 1, 86 N. E. 801, 21 L. R. A. (N. S.) 293, 16 Ann. Cas. 1102. This exception applies, in this case, to the dismissal of the 33 indictments returned in 1923, because such dismissals were procured, and illegally procured at that, by the accused, himself.

■ Appellee contends that each and all the indictments, and the prosecutions thereon, constituted but one continuing act, and one cause of action, and that therefore the cause of action was not complete, and limitation thereon did not begin to run, until the last indictment was dismissed, in 1932, and that, as this suit was instituted within less than one year from that date, the cause of action was not barred. This court has reached the firm conclusion that appellee's contention is not sustained by authority or good reason. We conclude that, as each of the indictments returned against appellee was for a separate, distinct offense, alleging embezzlement of a distinct, specific item or sum, the wrongful prosecution thereof constituted a separate, distinct, cause of action, and that limitation began to run upon the end of that prosecution. The

question of conspiracy does not seem to have any bearing upon the issue of limitation, nor does the question of continuing act or offense, for appellee's cause of action does not rest, simply, upon the alleged conspiracy, as such, but upon actual prosecutions of various specific and distinct charges, each of which constituted a separate cause of action which arose at the end of that particular prosecution. Upon that theory we have concluded, and hold, that, upon the acquittal of appellee in the criminal cases upon which he was actually tried, his causes of action based upon the prosecution of those particular cases accrued, and limitation then began to run as to those prosecutions, and, as suits thereon were not instituted within the limitation period, those causes of action were barred.

The original 161 indictments returned against appellee, other than the one upon which he was acquitted upon a directed verdict in 1922, were dismissed later in the same year. Those indictments were based upon 161 separate transactions, each involving a different sum alleged to have been embezzled. Appellee having been tried upon one of those indictments, the prosecution thereof ended with such acquittal, and the remaining indictments were dismissed in 1922, and limitation thereon began to run with such dismissal. But, in 1923, before the bar was complete, indictments were renewed as to 33 of the transactions embraced in the original 161 indictments, whereby limitation as to those 33 transactions was interrupted. But the prosecution upon the remaining 128 transactions ended with their dismissal in 1922, and, not being thereafter renewed, appellee's cause of action accrued thereon with that dismissal, and were forever barred when suit was not instituted thereon within the limitation period.

With reference to the prosecutions of the 33 indictments, the prosecution of one of them ended with the acquittal of appellee, in 1926; and, as suit was not instituted upon that prosecution within the limitation period, the cause of action thereon was barred. As the remaining 32 indictments were not dismissed until 1932 and this suit was timely instituted within one year thereafter, this action for malicious prosecution thereon was not barred. We hold, therefore, that appellee's cause of action was barred as to the prosecutions of all the indictments, except the 32 which were not dismissed until 1932.

Because of the conclusion arrived at from an exhaustive study of the record, that appellants had probable cause for the prosecutions complained of by appellee, it is ordered that the judgment appealed from be reversed, and that judgment be here rendered that appellee take nothing by his suit, and pay all costs of the litigation.