# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-06-00705-CV

**Anthony L. Martinez, Appellant**

**v.**

**John Michael English, Appellee**

### FROM THE DISTRICT COURT OF COMAL COUNTY, 274TH JUDICIAL DISTRICT
### NO. C98-351C, HONORABLE JACK H. ROBISON, JUDGE PRESIDING

## O P I N I O N

Anthony L. Martinez appeals a district court judgment awarding John Michael English ("English" or "Mike English") $227,000 in actual damages based on jury findings that Martinez maliciously prosecuted English, caused English to be falsely imprisoned, committed abuse of process against English, and intentionally inflicted emotional distress upon English. The jury likewise answered in the affirmative on a malice issue predicated on the jury's malicious prosecution finding and awarded English $21,000 in exemplary damages; these damages were also awarded in the judgment. The judgment additionally awarded English $5,500 in quantum meruit damages and $28,000 in trial-level attorney's fees, plus another $5,000 in attorney's fees "if this case is appealed to the Texas Court of Appeals" and $3,000 "if this case is appealed to the Supreme Court of Texas."

In seven issues, Martinez challenges the legal and factual sufficiency of the evidence supporting the jury's liability findings regarding malicious prosecution, false imprisonment, abuse of process, and intentional infliction of emotional distress; the factual sufficiency of the evidence supporting the jury's actual damages award on the tort claims; and the exemplary damages award. Martinez also complains of the district court's award of appellate attorney's fees without conditioning them on English's success in any appeal. Martinez does not appeal the judgment as to quantum meruit damages and trial-level attorney's fees.

For reasons we explain herein, we will reverse the portions of the district court's judgment Martinez challenges and render judgment that English take nothing on those claims.

## BACKGROUND

Anthony Martinez is a licensed Colorado attorney who lives in Salida, Colorado. Mike English lives in San Antonio, Texas, where he restores Mercedes vehicles. John English, now deceased, was the father of Mike English and owned property in the Salida, Colorado area.

Martinez and Mike English became acquainted when John English hired Martinez to represent him in a matter in a Colorado trial court. Although Martinez agreed to represent John English, they did not enter into a formal written agreement, and there is some uncertainty regarding whether Martinez had agreed to represent Mike English as well.[1] The Englishes paid the

---

[1] Martinez testified that he believed he was being hired by both John and Mike English. According to Martinez, his initial contact was with Mike English, not John English, and it was Mike English who paid the retainer. In addition, Martinez mailed bills and correspondence addressed to either "Michael or John English" or "Michael and John English." According to Martinez, the Englishes never objected or corrected him.

2

full $11,735.36 billed by Martinez for his trial-level work. The trial court ultimately ruled against John English. Thereafter, John English (or the Englishes) and Martinez discussed the possibility of an appeal. Martinez's fee for the additional work was discussed, though the parties dispute the facts surrounding the fee negotiation. Martinez testified that he told the Englishes that the appeal could cost as much as $10,000, while Mike English testified that Martinez told him that he would handle the appeal for approximately $3,500 if the Englishes paid the transcript costs and filing fees. Martinez ultimately billed the Englishes for approximately $8,500 in appellate attorney's fees.

At some point during their discussions, Martinez learned that Mike English made his living restoring Mercedes vehicles. It so happened that Martinez owned a Mercedes that he wanted restored. Sometime in May 1996, Martinez and the Englishes agreed that Mike English would restore Martinez's Mercedes in return for Martinez's legal services. However, no formal written agreement was signed, and the parties appear to have had differing expectations as to the extent of the work to be performed by English. Martinez, for example, testified that he believed that the cost of painting the car's exterior was included in the legal services "trade off." According to English, however, Martinez had agreed that either he would not have the car painted or that, if he did have the car painted, painting costs would not be included in the trade off because, as English testified, a paint job could cost as much as $15,000. Additionally, Judy English, Mike English's daughter-in-law, testified that she sent a letter to Martinez estimating the costs of the Mercedes restoration and noting that $3,500 of these costs were to be paid by the "trade-out." Martinez testified that he never received such a letter.

According to Martinez, sometime in November 1996, he received a call from English, who indicated that "before and after" photos had been prepared and were being mailed to Martinez.[2] Martinez testified that he never received the photos. In April 1997, although he had heard nothing more from English since the November phone call, Martinez purchased one-way airline tickets from Denver to San Antonio. He planned to fly with his wife to San Antonio to pick up the car. Martinez explained that, in light of his November phone call with English and the fact that eleven months "seemed like a reasonable period of time to do a small amount of restoration," he had simply assumed that the restoration work was complete. After purchasing the airline tickets, Martinez called English to let him know he would be arriving in May to pick up the vehicle. English told him that the vehicle was not ready and would not be ready by May, but would likely be ready by September. Martinez agreed to wait.

In May 1997, English informed Martinez that additional money would be necessary to complete the exterior restoration work on the car, including the painting. English had taken the car to Mexico, where the exterior restoration was to be completed by Antonio Cardenas. According to English, Cardenas was to perform all of the exterior restorations, which included spraying the paint, preparing the metal, and lining the body. English testified that he called Martinez to request funds for the paint job and that Martinez agreed to send the funds the next day. However, according to English, it was 26 days later before he received any portion of the money and 38 days before he received payment in full. Apparently frustrated by the delay in payment, Cardenas refused

---

[2] Martinez testified that he had not been driving the Mercedes regularly and was not in a particular hurry to have the work performed.

4

to continue working on the car, and English brought the car back to San Antonio. At this point, English still had some of Martinez's paint money left, and the car still needed to be sprayed. In an attempt to have the remaining work completed, English took the car to Frank Villarreal at Cupples Automotive in San Antonio. The car remained at Cupples until December 1997.

By June 1997, deciding that he "didn't feel right about having a car with a $5,000 paint job" because he "had a kid going to college the following fall," Martinez began discussing the possibility of selling the Mercedes once it had been restored. According to English, Martinez asked him to find a buyer for the car. Over the course of the next few months, English found a possible buyer, but the deal fell through.[3] On November 19, 1997, after the sale had fallen through, Martinez called English and demanded that English return the car to him. The conversation became heated. English testified that he told Martinez that he was willing to return the car but first wanted to settle their account. According to Martinez, English simply refused to return the car. English further testified that, in response to his refusal to immediately return the car, Martinez threatened, "I've got friends that will take care of you, Mr. English."

Martinez testified that, on November 10, 1997, he had met with Leonard Post, who, at the time, was an investigator for the district attorney's office for Chaffee County, Colorado. Martinez explained the situation with English and, according to Martinez, "discussed what was going on and tried to figure out . . . whether the case should proceed as a civil case or as a criminal case." According to Martinez, the result of the meeting was that both Post and Martinez agreed to try to

---

[3] There is conflicting testimony as to who called off the sale—Martinez or the prospective buyer.

5

contact English to work things out. After the November 19 phone call between English and Martinez, Martinez again contacted Post, explaining that English had refused to return the vehicle. Martinez testified that "[a]t that point, I pretty much put it in Leonard's hands, and Leonard proceeded with this investigation." Two charges were subsequently filed against English in Chaffee County, Colorado—felony auto theft and fraud affecting sales. A warrant was issued for English's arrest. On December 3, 1997, English was arrested in Texas pursuant to this Colorado arrest warrant. After English appeared in court in Chaffee County, Colorado, a compromise was reached in which the charges were dropped in exchange for English's agreement to pay $5,000 and to turn over the vehicle parts to Autohaus Imports in San Antonio, where the vehicle would be serviced as directed by Martinez.

English subsequently sued Martinez in Comal County district court, asserting claims for malicious prosecution, abuse of process, false imprisonment, intentional infliction of emotional distress, quantum meruit, and breach of contract. The jury found in favor of English on all claims and awarded actual damages in the amount of $227,000 based on the four tort claims, $5,500 on the quantum meruit claim, and $1,000 on the breach of contract claim. It additionally awarded English $28,000 in trial-level attorney's fees, $5,000 in appellate attorney's fees for an appeal to the court of appeals, and another $3,000 in fees for an appeal to the supreme court. Predicated on its malicious prosecution finding, the jury also found that Martinez had acted with malice and awarded English $21,000 in exemplary damages. The district court rendered final judgment awarding a total of $232,500 in actual damages (representing the actual damages the jury had

awarded on the tort claims and the quantum meruit claim[4]) and $21,000 in exemplary damages. It also awarded $28,000 in trial-level attorney's fees and, without predicating them on English's success on appeal, the appellate attorney's fees the jury had awarded.

Martinez filed a motion for judgment notwithstanding the verdict, arguing that there was no evidence to support the jury's findings. In addition, he filed a motion for new trial in which he argued that the evidence was factually insufficient to support the jury's findings and that the damage award was excessive. The district court overruled both motions. Martinez appeals.

## ANALYSIS

Martinez brings seven issues on appeal. In his first four issues, Martinez challenges the legal and factual sufficiency of the evidence supporting the jury's findings that Martinez maliciously prosecuted English, committed false imprisonment and abuse of process, and intentionally inflicted emotional distress. In his sixth issue, Martinez contests the factual sufficiency of the evidence supporting the jury's $227,000 actual damages award on these tort claims. In his fifth issue, Martinez contends that the district court erred in awarding exemplary damages. Finally, in his seventh issue, Martinez complains of the district court's failure to condition its award of appellate attorney's fees to English on a successful appeal.

---

[4] The district court did not award damages based on the jury's $1,000 breach-of-contract damage award.

**Evidentiary sufficiency**

In his first four issues, Martinez argues that there was legally and factually insufficient evidence to support the jury's findings on English's claims for malicious prosecution, abuse of process, false imprisonment, and intentional infliction of emotional distress.[5]

---

[5] English contends that Martinez failed to preserve any of his legal-sufficiency arguments because his post-trial motions referred solely to factual insufficiency. We conclude that Martinez preserved his legal sufficiency complaints by, among other means, arguing in his j.n.o.v. motion that "no evidence" supported the jury findings Martinez now appeals.

English also argues that, as a threshold matter, "all of Martinez's complaints" regarding the tort findings "fail as a matter of law because the State of Colorado did not have jurisdiction to criminally charge English." English relies on the assertion that Martinez made false statements to Colorado authorities that English had entered Colorado and taken Martinez's car when, in fact, English "never entered Colorado and never took Martinez's Mercedes-Benz out of Colorado, as alleged by Martinez." English urges that this "jurisdictional flaw . . . makes the original process improper and without legal authority [and] everything that followed the initiation of the criminal proceeding against English was legally inappropriate." English reasons that "because of the *a priori* nature of the necessity of jurisdiction in the criminal proceedings that underlie this case, Martinez cannot attack the judgment based upon the sufficiency of the evidence (unless, of course, he could go back in time and take back the threshold lie he told Colorado law enforcement in order to establish jurisdiction)."

Among other responses to English's argument, Martinez disputes that the Colorado court lacked subject-matter jurisdiction over English, citing phone calls between Colorado and Texas and English's presence in the Colorado court. Martinez similarly emphasizes that English never challenged jurisdiction in his criminal proceeding. Even if there was any doubt about the Colorado court's jurisdiction, Martinez adds, there is no authority to support English's theory that this would foreclose Martinez's appellate issues. We agree. The gist of English's reasoning is that a plaintiff can establish, as a matter of law, his or her entitlement to recover for malicious prosecution (or related torts arising from a criminal prosecution like abuse of process or false imprisonment) by collaterally attacking the criminal court's subject-matter jurisdiction in the subsequent tort case, and prevail on that fact alone, without need to prove each element of the tort. Although the question of whether the criminal court had jurisdiction might conceivably bear upon certain elements of such claims (e.g., the malice element of malicious prosecution), and it *might have been* a ground for obtaining a favorable termination of the criminal case if it had been raised, English cites no authority—and we are aware of none—that would support his notion that he can raise an after-the-fact collateral attack on the criminal court's jurisdiction in the subsequent tort action and prevail as a matter of law on that ground alone.

We sustain a legal sufficiency complaint if the record reveals: (a) the complete absence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; or (d) the evidence establishes conclusively the opposite of the vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005). The ultimate test for legal sufficiency is whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review. *See id.* at 827.

When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is less than a scintilla and, in legal effect, is no evidence. *See Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004). But more than a scintilla of evidence exists if the evidence rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Id*. We review the evidence in the light favorable to the verdict, crediting favorable evidence if reasonable jurors could and disregarding contrary evidence unless reasonable jurors could not. *See City of Keller*, 168 S.W.3d at 807.

### *Malicious prosecution*

To successfully assert a claim for malicious prosecution, a plaintiff must show by a preponderance of the evidence that (1) a criminal prosecution was commenced against him; (2) the defendant initiated or procured that prosecution; (3) the prosecution terminated in his favor; (4) he was innocent of the charges; (5) the defendant lacked probable cause to initiate the prosecution; (6) the defendant acted with malice; and (7) he suffered damages. *Richey v. Brookshire Grocery Co.*, 952 S.W.2d 515, 517 (Tex. 1997). Martinez challenges the sufficiency of the evidence to support

9

the third, fourth, fifth, and sixth elements of a malicious prosecution cause of action. We need only consider the third element—whether there is sufficient evidence that the prosecution terminated in English's favor.

It is undisputed that the charges against English were dropped. However, it is also undisputed that those charges were only dropped after English agreed to pay $5,000 in restitution and to turn over the car. Thus, the question before us is whether such an agreement amounts to a termination of the prosecution in English's favor. *See Richey*, 952 S.W.2d at 517.

The Restatement (Second) of Torts addresses this situation, which it terms an "indecisive termination of proceedings":

> A termination of criminal proceedings in favor of the accused other than by acquittal is not a sufficient termination to meet the requirements of a cause of action for malicious prosecution if
>
> (a)      the charge is withdrawn or the prosecution abandoned pursuant to an agreement of compromise with the accused . . .

Restatement (Second) of Torts § 660 (1977). Comment c to section 660 further provides:

> Although the accused by his acceptance of a compromise does not admit his guilt, the fact of compromise indicates that the question of his guilt or innocence is left open. Having bought peace the accused may not thereafter assert that the proceedings have terminated in his favor.

*Id.* § 660 cmt. c. Texas cases have uniformly followed this rule. *See, e.g.*, *Leal v. American Nat'l Ins. Co.*, 928 S.W.2d 592, 597 (Tex. App.—Corpus Christi 1996, writ denied); *Ellis v. Sinton Savs. Ass'n*, 455 S.W.2d 834, 842 (Tex. Civ. App.—Corpus Christi 1970, writ ref'd n.r.e.); *Sullivan*

*v. O'Brien*, 85 S.W.2d 1106, 1115 (Tex. Civ. App.—San Antonio 1935, writ ref'd); *see also Bertuca v. Martinez*, No. 04-04-00926-CV, 2006 Tex. App. LEXIS 1386, at *8-11 (Tex. App.—San Antonio 2006, no pet.) (mem. op.); *Withem v. Underwood*, No. 05-94-01310-CV, 1997 Tex. App. LEXIS 5978, at *11 (Tex. App.—Dallas 1997, no pet.).

As it is undisputed that the charges against English were dropped pursuant to an "agreement of compromise," there is no evidence that the criminal proceeding was terminated favorably to English as required to prove malicious prosecution. *See* Restatement (Second) of Torts § 660. As English has failed to present evidence to support this element of his malicious prosecution claim, he cannot recover under that theory. *See Richey*, 952 S.W.2d at 517. Accordingly, we sustain Martinez's first issue.

### *Abuse of process*

A claim for abuse of process requires (1) an illegal, improper, or "perverted" use of the process, neither warranted nor authorized by the process, (2) an ulterior motive or purpose in exercising such use, and (3) damages as a result of the illegal act. *Preston Gate, LP v. Bukaty*, 248 S.W.3d 892, 897 (Tex. App.—Dallas 2008, no pet.). The "critical aspect" of an abuse of process claim is the improper use of the process *after it has been issued*. *Id.*; *Bossin v. Towber*, 894 S.W.2d 25, 33 (Tex. App.—Houston [14th Dist.] 1994, writ denied). In other words, abuse of process applies to a situation where a properly issued service of process is later used for a purpose for which it was not intended. *Id.* If the claim is that wrongful intent or malice caused the process *to be issued initially*, the claim is one for malicious prosecution, not for abuse of process. *Id.*

11

In asserting his abuse of process claim, English neither alleges nor presents evidence that service of process was used illegally or improperly after it was issued. Rather, his claim is that Martinez acted with wrongful intent in causing the process to be issued initially. Such a claim is one for malicious prosecution, not abuse of process. *See id.* Because English has presented no evidence of abuse of process, we sustain Martinez's second issue.

### *False imprisonment*

The elements of false imprisonment are (1) willful detention, (2) without consent, and (3) without authority of law. *Wal-Mart Stores, Inc. v. Rodriguez*, 92 S.W.3d 502, 506 (Tex. 2002). If an arrest or detention is executed under process which is legally sufficient in form and duly issued by a court of competent jurisdiction—where an arrest is made pursuant to a valid arrest warrant, for example—there is no cause of action for false imprisonment. *James v. Brown*, 637 S.W.2d 914, 918 (Tex. 1982); *Emerson v. Borland*, 927 S.W.2d 709, 721 (Tex. App.—Austin 1996, writ denied). To determine whether an arrest warrant was valid, we look only to the form of the process by which the arrest warrant was made; we do not determine, for example, whether probable cause existed to issue the warrant. *Id.* If the warrant is valid on its face, our inquiry ends there. *Id.*; *Bossin v. Towber*, 894 S.W.2d 25, 32 (Tex. App.—Houston [14th Dist.] 1994, writ denied).

Here, English challenges the grounds on which the warrant was issued, not the warrant's facial validity. As English was arrested pursuant to a valid arrest warrant, there can be no cause of action for false imprisonment. *See James*, 637 S.W.2d at 918; *Emerson*, 927 S.W.2d at 721; *Bossin*, 894 S.W.2d at 32. Accordingly, we sustain Martinez's third issue.

*Intentional infliction of emotional distress*

To recover on a cause of action for intentional infliction of emotional distress, a plaintiff must show that (1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was "extreme and outrageous"; (3) the defendant's actions caused the plaintiff emotional distress; and (4) the resulting emotional distress was severe. *Hoffmann-La Roche, Inc. v. Zeltwanger*, 144 S.W.3d 438, 445 (Tex. 2004). However, the supreme court has described the tort of intentional infliction of emotional distress as,

> first and foremost, a gap-filler tort, judicially created for the limited purpose of allowing recovery in those rare instances in which a defendant intentionally inflicts severe emotional distress in a manner so unusual that the victim has no other recognized theory of redress. The tort's clear purpose . . . was to supplement existing forms of recovery by providing a cause of action for egregious conduct that might otherwise go unremedied. We cautioned, however, that the tort was a gap-filler tort that should not be extended to circumvent the limitations placed on the recovery of mental anguish damages under more established tort doctrines.

*Id.* (citing *Standard Fruit & Vegetable Co. v. Johnson*, 985 S.W.2d 62, 68 (Tex. 1998)) (internal citations and quotations omitted). The supreme court further explained that "[i]n creating the new tort, we never intended that it be used to evade legislatively-imposed limitations on statutory claims or to supplant existing common law remedies." *Id.* A plaintiff cannot recover on a claim for intentional infliction of emotional distress where the risk of emotional distress "is merely incidental to the commission of some other tort." *Standard Fruit & Vegetable Co.*, 985 S.W.2d at 68. Even where the plaintiff is unable to recover on his primary claim, he cannot maintain an action for intentional infliction of emotional distress where the "gravamen" of his complaint may be addressed by an existing statutory or common-law remedy. *Hoffmann-LaRoche, Inc.*, 144 S.W.3d at 447-48.

13

Martinez argues that no evidence supports the jury's intentional infliction finding because the gravamen of his complaint was emotional distress damages compensable through the malicious prosecution tort.[6] We agree. Here, the gravamen of English's complaint is addressed by his malicious prosecution claim. English alleges only that Martinez caused him emotional distress by illegally procuring the criminal prosecution that ensued. Similarly, English's evidence of emotional distress was limited exclusively to harm arising from the procurement and execution of the arrest warrant—from the arrest itself, from the circumstances under which Comal County law enforcement arrested him, from being jailed, and from being charged with a criminal offense. English testified that, for example, the arresting officers "put me on the ground and they put my arms behind me and they handcuffed me." While the officers were handcuffing him, his young daughter was curled up in the floor of the truck, but English

> didn't want to tell them that she was [there] and the reason for that I was just - I was in shock, I guess. I couldn't think. I just felt like everything was caving in, and all I could think about, I can't let them know that she's in the truck. I didn't want them to know because I knew what they would do. They would take her into their custody and she would go somewhere. The would put her in some kind of child protective thing overnight. She was too young for that.

---

[6] English argues that Martinez failed to preserve this argument because he did not specifically argue in the district court that the intentional infliction tort is a limited "gap-filler." We disagree. Martinez preserved this argument through his no-evidence challenges to the jury's findings on that issue. *See Rocky Mountain Helicopters, Inc. v. Lubbock County Hosp. Dist.*, 987 S.W.2d 50, 52 (Tex. 1998) (holding that appellant preserved its argument that no implied warranty arose under the facts of the case by arguing that no evidence supported the jury's findings that it violated the DTPA). Here, similarly, Martinez raised his argument that no cause of action for intentional infliction of emotional distress could arise under the facts of a case where there was no evidence of emotional distress outside of a claim for malicious prosecution.

14

English further testified that, "[n]ext to [his] mother's death, it was the worst moment of [his] life." After the arrest, English was taken to jail, where he spent "two days and maybe three nights." English testified that, during his time in jail, he was physically stressed and scared and was unable to eat or sleep. Sometime after he was released on bond, English traveled to Colorado to answer to the charges. According to English, when he appeared to discuss the charges with the prosecutors, some of the officers were carrying weapons. He was intimidated and "pretty upset" and feared that he might be cuffed and booked in a Colorado county jail.

The experiences that English recounted were no doubt highly unpleasant. The damages he seeks, however, relate to his prosecution and arrest and their aftermath, and would be compensable through the malicious prosecution tort. Because the tort of malicious prosecution allows for recovery for mental anguish and because English's claimed emotional distress arose solely from the alleged malicious prosecution, he cannot also maintain a claim for intentional infliction of emotional distress. *See id.* Accordingly, we sustain Martinez's fourth issue.

**Damages**

Our holdings regarding Martinez's first four issues are also dispositive of his fifth and sixth issues. In his sixth issue, again, Martinez challenges the factual sufficiency of the evidence supporting the jury's actual damages award on his tort theories. Because we have held that English cannot recover under any of these theories, we need not reach Martinez's sixth issue. In his fifth issue, Martinez urges that the district court erred in awarding exemplary damages. The jury's award of exemplary damages was predicated on its malice finding which, in turn, was predicated upon the jury's affirmative finding on the malicious prosecution issue. Because we have held there is legally

insufficient evidence to support the malicious prosecution finding, English cannot recover exemplary damages. *See* Tex. Civ. Prac. & Rem. Code Ann. § 41.003 (West 2008) (allowing recovery of exemplary damages only where "the claimant proves by clear and convincing evidence that the harm with respect to which the claimant seeks recovery of exemplary damages results from: (1) fraud, (2) malice; or (3) gross negligence"). We sustain Martinez's fifth issue.

**Attorney's fees**

Finally, in his seventh issue, Martinez contends that the district court erred in failing to condition its award of appellate attorney's fees upon a successful appeal. English agrees, citing our opinion in *Westtech Eng'g v. Clearwater Constructors, Inc.*, 835 S.W.2d 190, 205 (Tex. App.—Austin 1992, no writ). We sustain Martinez's seventh issue.

## CONCLUSION

We reverse the judgment of the district court awarding English $227,000 in actual damages on his tort claims and $21,000 in exemplary damages, and render judgment that English take nothing on those claims. We also reform the judgment to reflect that the award of appellate attorney's fees is conditioned upon English's success on appeal, reverse the judgment awarding $5,000 in attorney's fees based on Martinez's appeal to this Court, and render judgment that English take nothing on that claim.[7]

---

[7] We note again that Martinez did not appeal the portions of the judgment awarding quantum meruit damages and trial-level attorney's fees.

_____

Bob Pemberton, Justice

Before Chief Justice Law, Justices Pemberton and Waldrop

Reversed and Rendered

Filed:   August 29, 2008

17