# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-13-00080-CV

**Appellants, Central Austin Apartments, LLC; UP-32nd Street, LLC; and UP-32nd Street Hospitality, LLC// Cross-Appellants, East Avenue Property Owners' Association, Inc. and UP Austin Holdings, LP and UP Austin Land Holdings, LP**

**v.**

**Appellees, UP Austin Holdings, LP; UP Austin Land Holdings, LP; and East Avenue Property Owners' Association, Inc.// Cross-Appellees, Central Austin Apartments, LLC; UP-32nd Street, LLC; and UP-32nd Street Hospitality, LLC**

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 53RD JUDICIAL DISTRICT NO. D-1-GN-11-003367, HONORABLE SCOTT H. JENKINS, JUDGE PRESIDING**

## MEMORANDUM OPINION

The principal issue in this case is whether East Avenue Property Owners' Association, Inc. (the POA) had authority to levy a special assessment to complete basic infrastructure for a multi-million dollar property development that the original developer abandoned after becoming insolvent before the infrastructure was finished. The POA issued a $2.99 million special assessment to complete part of the essential infrastructure work, which was then allocated to the property owners pro rata based on property value. UP Austin Holdings, LP, which at that time owned one of the few developed lots in the project, and UP Austin Land Holdings, LP, a related entity that owned several undeveloped lots (collectively, UP Austin), sued for a declaration that the assessment was invalid and void and sought appointment of a receiver for the POA. *See* Tex. Bus.

Orgs. Code § 11.404 (appointment of receiver for domestic entity). UP Austin also sued other property owners who had voted to approve the assessment—Central Austin Apartments, LLC (CAA), UP-32nd Street, LLC (the Owner Declarant), and UP-32nd Street Hospitality, LLC (Hospitality) (collectively, the Owners)—seeking damages and attorney's fees under a minority-oppression theory.

Following a bench trial, the trial court (1) concluded that the POA lacked the power and authority, under the development's amended Covenants, Conditions, and Restrictions (Amended CCRs), to levy assessments for construction of original subdivision infrastructure and that the special assessment was therefore *ultra vires* and void *ab initio*; (2) nullified two subsequent amendments to the Amended CCRs and permanently enjoined the Owner Declarant from further amending the CCRs to increase its voting power or extend its control period without UP Austin's prior consent; (3) declined to appoint a receiver for the POA because nullifying the Amended CCRs and issuing a related permanent injunction were adequate alternative remedies; (4) found that the Owners oppressed UP Austin by using their control of the POA to levy the special assessment; (5) found that the Owner Declarant oppressed UP Austin with respect to the second and third amendments to the CCRs; and (6) denied UP Austin's request for prejudgment attorney's fees but conditionally granted UP Austin post-judgment and appellate attorney's fees. The trial court further denied (1) UP Austin's requests for actual and exemplary damages, (2) the POA's counterclaims to compel payment of the special assessment and for attorney's fees, and (3) the Owners' counterclaim for attorney's fees and cross-claims for reimbursement of the sums they had paid to the POA pursuant to the void special assessment. All of the parties challenge the trial court's judgment in numerous

2

respects, but they predominantly challenge the invalidation of the special assessment and the award and denials of attorney's fees. We will affirm in part, reverse and render in part, and reverse and remand in part.

## FACTUAL AND PROCEDURAL BACKGROUND[1]

The dispute in this case involves a multi-million dollar mixed-use redevelopment plan for the former Concordia University campus in Austin, Texas. In 2007, 2008, and 2009, the Austin City Council approved three site plan components of a planned unit development (PUD) for the site, which was then known as East Avenue and is now called University Park. A PUD is intended for large or complex developments that are under unified control and are planned as a single continuous project.[2] Once a unified site plan has been approved, the City will not issue permits or a permanent certificate of occupancy (CO) to any lot owner within the subdivision until all requirements of the unified site plan are satisfied, in addition to requirements specific to each

---

[1] The complicated factual and procedural background of this case is well known to the parties and will not be repeated at length in this opinion.

[2] The City of Austin's frequently-asked-planning-questions page explains,

> A [PUD] is intended for large or complex developments under unified control planned as a single continuous project, to allow single or multi-use projects within its boundaries and provide greater design flexibility for development proposed within the PUD. Use of a PUD district should result in development superior to that which would occur using conventional zoning regulations. PUD zoning is appropriate if the PUD enhances preservation of the natural environment; encourages high quality and innovative design and ensures adequate public facilities and services for development within the PUD.

austintexas.gov website (http://www.austintexas.gov/faq/planned-unit-development-pud-what-it) (accessed Oct. 30, 2014).

owner's individual lot. Until permanent COs are issued, temporary COs may be periodically issued if certain requirements are met.

After the PUD was approved, the original developer, East Avenue IG LP, organized the POA, enacted the Bylaws and original CCRs, and was named the "declarant" in the CCRs. The CCRs allow the declarant to exercise control over the direction and processes of the subdivision and POA until a time certain (the Declarant Control Period), at which point control will transition to the POA. The Declarant Control Period afforded East Avenue IG an opportunity to complete construction of the project and its infrastructure and amenities while protecting its investment in the development, which is typical and anticipated for the development of a PUD. Indeed, it is undisputed that the developer intended to fully fund and complete the original subdivision infrastructure for the University Park development. Unfortunately, East Avenue IG became insolvent before completing a significant portion of the essential infrastructure—including streets, drainage, sidewalks, and utilities—and without posting adequate fiscal security with the City of Austin to ensure its completion.

When the original developer pulled out, the development consisted of several individually owned condominium units, an office building on Lot 4 that was operating under a temporary CO (Lot 4), partially completed infrastructure, and several undeveloped lots. The cost to complete critical infrastructure was estimated to be $5.5 million.

On January 29, 2010, a series of transactions were consummated in which (1) the CCRs were amended to assign the declarant's rights and obligations to the Owner Declarant (the

4

Amended CCRs),[3] (2) several lots were transferred to the POA along with existing construction permits and materials, and (3) several undeveloped commercial lots were acquired by the Owner Declarant, CAA, and Hospitality, entities that were affiliated with Cypress Real Estate Advisors, Inc. (Cypress).[4] As part of the asset transfer, East Avenue assigned to the POA "[a]ll of [its developer's] rights pertaining to development of [the common area lots transferred to the POA] arising under Governmental Approval [permits, PUD ordinance, site plans, etc.] relating to or concerning all [or] any portion of the land." The sale of property to the Owners was "a transfer of assets only and no liabilities or obligations." In purchase and sale documents, the Owners also expressly disclaimed any responsibility for the sellers' general obligations, and correspondingly, the sellers warranted that they had not made any commitments to third parties that would obligate the Owners "to construct, install, or maintain any improvements . . . on or off [the land conveyed to the Owners]." Contemporaneously with the sales transactions, principals or persons affiliated with Cypress became Board members of the POA.[5]

Following the preceding transactions, Lot 4 remained in the hands of an entity affiliated with the original developer. In June 2010, however, the lender foreclosed on Lot 4 and

---

[3] Under section 9.06 of the original CCRs and the Amended CCRs, the declarant "may, by written instrument, assign, in whole or in part, any of its privileges, exemptions, rights and duties under this Declaration to any person or entity and may permit the participation, in whole, in part, exclusively, or non-exclusively, by any other person or entity in any of its privileges, exemptions, rights and duties [under the CCRs]."

[4] According to the record, Cypress, a non-party, manages a real-estate investment fund under which the Owners are organized.

[5] Under the Amended CCRs, the Owner Declarant has "the absolute right to appoint members of the Board" during the Declarant Control Period, which lasts at least until December 31, 2020, but may assign or delegate its rights and powers to the POA, the board, or any other entity.

subsequently paid more than $370,000 to complete remaining infrastructure in common areas adjacent to that lot. The following year, UP Austin acquired Lot 4 from the lender. At the time of its acquisition, UP Austin knew that the Lot 4 office building lacked a permanent CO, that site-specific infrastructure was required for it to obtain a permanent CO, and that other infrastructure not directly benefiting Lot 4 was required under the site plan. Subsequent to the Lot 4 transaction, UP Austin also procured additional undeveloped lots in the University Park development.

The foregoing transactions resulted in fragmented ownership of property subject to site plans for a PUD, which might be described colloquially as an "all for one, one for all" endeavor. The resulting lack of unified control, coupled with the divergent and intertwined interests of the property owners, is the genesis of the underlying lawsuit, which principally concerns the various parties' rights and obligations with respect to completing the infrastructure required under the approved site plans.[6]

Both before and after UP Austin acquired its interests in University Park, the property owners engaged in negotiations in an attempt to find a solution to their mutual infrastructure problems. Due to issues about correlative rights, obligations, and needs, the property owners reached what appeared to be an impasse as to the means, manner, and timing of funding and completing the outstanding infrastructure. Due to the apparent stalemate, the POA, purporting to exercise its assessment power under the Amended CCRs, levied a $2.99 million special assessment to complete some of the outstanding infrastructure, much of which was offsite or partially offsite in the public

---

[6] For example, UP Austin cannot obtain a permanent CO for the Lot 4 office building without construction of a water-quality pond on Lot 1, which is owned by CAA and is not within the common area.

right-of-way assessment and did not include some of the work necessary for UP Austin to obtain a permanent CO for Lot 4.[7]

The Owners all voted in favor of the assessment, and UP Austin opposed it.[8] In accordance with the assessment formula provided in the Amended CCRs, the special assessment was then allocated pro rata to each lot owner based on each lot's appraised value.[9] Because UP Austin owned the only lot that had been commercially developed, this formula resulted in $1.65 million of the special assessment (55%) being allocated to UP Austin, which owned only 27% of the non-exempt acreage. With respect to Lot 4 specifically, that tract represented less than 10% of the non-

[7] The POA had previously issued a more limited special assessment that precipitated the initial lawsuit filing, but that assessment was amended in December 2011, and it is the amended assessment that is presently at issue. Neither a regular nor special assessment had ever been levied by the POA prior to the disputed special assessment.

[8] As the declarant under the Amended CCRs, the Owner Declarant had enough voting power to approve the special assessment without the agreement of any other member. The trial court found, however, that CAA, Hospitality, the Owner Declarant, and the POA were under common control by Cypress or individuals associated with Cypress and therefore concluded that they acted collusively with one another to approve the special assessment.

[9] The Amended CCRs provide the following formula for allocating a special assessment among the property owners:

> The Declarant, for each Lot owned within the Property, hereby covenants, and each Owner by acceptance of a deed to a Lot (but excluding Common Area Lots) . . . is deemed to covenant and agree to pay to the Association . . . special assessments as hereafter provided, each based on the Pro-Rata Share of each Owner. The 'Pro-Rata Share' of each of the Lots will be a fraction, the numerator of which is the TCAD value of the Lot (with Improvements) and the denominator of which is the TCAD value of all of the Lots (with Improvements) subject to this Declaration, excluding the Common Area Lots. The TCAD value will mean and refer to the market value determined by the Travis Central Appraisal District (or its successors) for ad valorem tax purposes for the calendar year previous to the year for which the Association's assessment is made and without regard to special use designations, exemptions or pending judicial appeals of appraised value.

exempt acreage, but was allocated nearly 54% of the special assessment because it had the highest appraised value.

Although there were other issues and conflicts among the parties, the special assessment appears to have been the tipping point for the underlying litigation. The Owners paid their allocated portion of the special assessment, and the Owner Declarant paid the condominium owners' share because the individual owners of those units would not be significantly benefitted by the completion of the outstanding infrastructure. UP Austin, which would be directly benefitted by some of the special-assessment work but only generally benefitted by a significant portion of it, refused to pay the assessment and was issued a delinquency notice for the outstanding balance.

In lieu of paying the special assessment, UP Austin filed suit seeking a declaration, among other claims, that the Owner Declarant was responsible for completing that infrastructure at its own expense.[10] It eventually abandoned or settled several of its initially asserted claims.[11]

---

[10] Pertinent to the issues on appeal, the Amended CCRs specify that the declarant has the right but not the obligation to develop the property as follows:

> It is contemplated that the Property will be developed pursuant to a coordinated plan, which may, from time to time, be amended or modified. Declarant reserves the right, but will not be obligated, to create and/or designate Lots, Special Common Areas and Common Areas and to subdivide with respect to any of the Property pursuant to the terms of this *Section 8.05*, subject to any limitations imposed on portions of the Property by any applicable plat. These rights may be exercised with respect to any portions of the Property. As each area is developed or dedicated, Declarant may designate the use, classification and such additional covenants, conditions and restrictions as Declarant may deem appropriate for that area.

[11] The trial court found that UP Austin had asserted and abandoned the following claims:

> UP Austin sought injunctive relief against the [Owners] relating to their obligations under the Amended CCRs, but [UP Austin] abandoned those claims. [UP Austin] sought temporary and permanent injunctions against the [Owners], ordering them to:

8

Ultimately, UP Austin's main claims sought to invalidate the special assessment for both offsite and common-area construction of initial infrastructure, to have a receiver appointed for the POA pursuant to section 11.404 of the Texas Business Organizations Code, and to recover actual and exemplary damages from the Owners based on a theory of minority oppression. The POA asserted a counterclaim against UP Austin for failing to pay the special assessment and sought attorney's fees; the Owners asserted a counterclaim against UP Austin for attorney's fees and a cross-claim against the POA to recover the amounts each of them paid pursuant to the special assessment if it was held to be void.[12]

Shortly before the lawsuit was filed, the Owner Declarant exercised its unilateral right to amend the CCRs in the following pertinent ways:[13] (1) extending the Declarant Control period

---

(i) keep the property free of rubbish and debris; (ii) keep the property free from improperly screened construction materials; (iii) provide proper care for the mature trees and other vegetation; (iv) complete the Common Area infrastructure already begun; and (v) complete the other unfinished construction; or (vi) alternatively, return the affected portions of the lots to their pre-construction, re-vegetated condition; claims which [UP Austin] abandoned at or before trial. Plaintiffs also pled, then abandoned, a request for "a declaration under the Texas Uniform Declaratory Judgments Act that [the Owner Declarant] is required to complete the infrastructure begun by [East Avenue IG] included in the disputed special assessment. (Second alteration in original).

UP Austin does not dispute this fact finding, but explains that some of the claims were "abandoned" only because they appeared to have been resolved by a Rule 11 agreement that was substantially performed before the trial court determined that it was unenforceable by specific performance and had been conditioned on the right to seek reimbursement after performance.

[12] The Owner Declarant paid $515,792; CAA paid $291,972; and Hospitality paid $279,701.

[13] Section 9.05 of the Amended CCRs provides: "Notwithstanding the provisions of *Section 9.03* above, during the Declarant Control Period, the Declarant may amend this Declaration without the joinder or consent of any person."

9

until "neither Declarant, nor any entity that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with Declarant, owns any Lots within the Property"; (2) increasing its voting power from seven votes per owned acre of land to seven votes per acre *plus* two votes for every one vote exercisable by the non-declarant property owners; and (3) deleting a cap[14] on the amount of special assessments, which could be overridden only by a majority member vote (second amended CCRs). While the lawsuit was pending, the Owner Declarant amended the CCRs a third time by adding a provision requiring the POA to reimburse an owner for the amount of any remitted assessment, plus interest, if the assessed amount is determined by the board to be in excess of the owner's allocated share or by a court to have been improperly levied (third amended CCRs).

It was essentially undisputed that initial infrastructure for a PUD is usually completed and funded by the developer rather than by the property owners' association while the property is under the developer's control. It is further undisputed that the developer usually deposits sufficient funds with the city to secure completion of the infrastructure. In this case, however, neither of the customary practices occurred. Indeed, all the parties to the dispute agree that the circumstances presented are unique; the witnesses at trial testified that none had encountered another commercial real-estate transaction in which the original developer became insolvent before completing the initial infrastructure under a unified site plan, ownership of the property had been divided among several

---

[14] "No special assessment which (together with all prior special assessments levied in the same calendar year) would exceed 25% of the current year's regular assessment may be made until the same is approved by a vote of the Members holding at least 51 percent of the votes in the Association." Amended CCRs § 4.04.

parties, and the controlling documents did not expressly obligate any party to complete the infrastructure. The POA and the Owners pointed out that these circumstances, however, were known to UP Austin when it acquired its land interests at University Park. They also took the position that, although the circumstances were unanticipated, the language of the dedicatory instruments was broad enough to permit the POA to levy an assessment to resolve the impasse and, given that authority, the POA had discretion as to which improvements to include in the special-assessment work.

The overriding issue was thus whether the POA's dedicatory instruments—the Amended CCRs and the Bylaws—permitted the POA to issue a special assessment to complete new construction of initial site infrastructure.

After a lengthy bench trial, the trial court made three principal liability findings:[15] (1) the POA lacked authority to make a special assessment for the purpose of constructing initial site infrastructure; (2) the Owners, acting together, oppressed UP Austin "by levying a special assessment through the Cypress-controlled POA that would disproportionately impose the costs of initial infrastructure on UP Austin (and selecting infrastructure that would not permit UP Austin to get its [permanent CO])";[16] and (3) the Owner Declarant oppressed UP Austin by enacting the

---

[15] The trial court made a number of alternative holdings that are challenged on appeal but which we do not reach.

[16] The trial court found the special assessment oppressive on the basis that the Owners "aimed to minimize, if not eliminate, any benefit to UP Austin and the Lot 4 office building from the special assessment work," "expected only one of the twenty-two special assessment projects . . . to assist UP Austin in obtaining a permanent [CO]," and excluded construction of a water-quality pond on CAA's property from the special assessment knowing that UP Austin could not get a permanent CO for Lot 4 unless and until that work was completed. Underlying these findings is the trial court's conclusion of common control among the Owners and the POA, which the Owners challenge on the basis of insufficient pleadings and evidence.

11

second and third amended CCRs. Based on these determinations, the trial court declared the special assessment void, invalidated the second and third amended CCRs, and permanently enjoined the Owner Declarant from further amending any of its dedicatory instruments for the purpose of increasing its voting power or extending the Declarant Control period without UP Austin's prior written consent. *See* Tex. Prop. Code § 202.001 (defining "dedicatory instrument"). The court, however, denied appointment of a receiver, concluding that nullification of the second and third amended CCRs and the related permanent injunction were sufficient alternative remedies.[17] *See* Tex. Bus. Orgs. Code § 11.404(b)(3) (court may only appoint receiver if all other available legal and equitable remedies are inadequate). The court further denied UP Austin's requests for actual and exemplary damages, but ordered the return of $1.6 million that UP Austin had deposited into the court's registry as its pro rata share of the disputed assessment for Lot 4.

With regard to the parties' attorney-fee requests, the court concluded that (1) it would be equitable and just for each party to bear its own attorney's fees in the trial court; (2) UP Austin prevailed on some of its claims against the POA and the Owners, but not others; (3) not all of the claims on which UP Austin prevailed authorized an award of attorney's fees; (4) the attorney's fees could be segregated, and not all legal tasks on each claim were inextricably intertwined; (5) UP Austin failed to segregate attorney's fees despite numerous requests and opportunities to do so; (6) UP Austin's failure to segregate fees was "a willful decision"; (7) UP Austin failed to

---

[17] It does not appear that UP Austin specifically complained about the enactment of the second and third amended CCRs or requested the remedies the trial court granted. The trial court, however, determined that "[s]uch relief was consistent with the Court's power under UP Austin's general prayer."

12

present competent evidence that its prejudgment attorney's fees were reasonable and necessary; and (8) UP Austin was the prevailing party on the threshold declaratory-judgment claim (invalidation of the special assessment), the POA was not the prevailing party on that claim, and the Owners were not the prevailing party on that claim because they approved the special assessment through their control of the POA. Based on these holdings, the trial court denied the POA's and the Owners' claims for attorney's fees and denied UP Austin's claim for prejudgment attorney's fees, but generally granted UP Austin conditional appellate attorney's fees.

The court denied all other claims, including the Owners' requests for reimbursement of remitted assessment fees under theories of "money had and received," negligent misrepresentation, and unjust enrichment. Underlying the court's minority-oppression findings and denial of the Owners' cross-claims were various fact findings to the effect that the Owners and the POA were under the common control of Cypress and had colluded to levy the special assessment in a manner disadvantageous to UP Austin, both in its allocation and in the selection of infrastructure to be completed.[18]

All parties filed notices of appeal attacking, in multiple respects, the judgment, findings of fact, and conclusions of law. The parties also seek to recover their own attorney's fees while opposing liability for any other party's attorney's fees.

---

[18] The Owners concede that they are each related to Cypress, a non-party that manages an investment fund overseeing those entities, but they contend there is no or insufficient evidence of common control. They further assert that UP Austin failed to plead and prove any theories based on alter-ego, veil piercing, or vicarious liability and expressly disclaimed any intent to assert an alter-ego theory of liability, which the court acknowledged at the final-judgment hearing.

**DISCUSSION**

**A. Validity of Special Assessment for Construction of Initial Subdivision Infrastructure**

The threshold issue presented is whether the POA had authority to issue a special assessment for the purpose of constructing original subdivision infrastructure.[19] The POA has the powers and authority enumerated in its dedicatory instruments. *See Pine Trail Shores Owners' Ass'n, Inc. v. Aiken*, 160 S.W.3d 139, 146 (Tex. App.—Tyler 2005, no pet.). The POA bears the burden of proving its authority to levy the special assessment. *Id.*; *see Indian Beach Prop. Owners' Ass'n v. Linden*, 222 S.W.3d 682, 691 (Tex. App.—Houston [1st Dist.] 2007, no pet.) ("A party seeking enforcement of a deed restriction always has the burden at trial to demonstrate the enforceability of the restriction."); *Dyegard Land P'ship v. Hoover*, 39 S.W.3d 300, 308 (Tex. App.—Fort Worth 2001, no pet.) (party seeking enforcement of restrictive covenant bears burden of proving validity and enforceability of covenants).

The Amended CCRs include a number of provisions pertinent to our resolution of this issue:

> 3.06 Duties of the Association. . . . The Association . . . shall have and perform each of the following duties, as necessary:
>
> . . . .
>
> (e) Collection of Assessments. The Association shall levy and collect assessments to provide for the operation, maintenance, repair, replacement,

---

[19] The parties do not dispute that the POA has some assessment authority, but they disagree as to the extent to which it is constrained by the plain language of the CCRs as opposed to being limited solely by the POA's reasonable discretion. Because the POA has no discretion in the absence of authority, we must first ascertain the extent of the POA's assessment authority as a threshold matter.

preservation, and protection of the Common Area, and as otherwise necessary for the performance of the functions of the Association, in accordance with Article IV of this Declaration.

. . . .

3.07 <u>Powers and Authority of the Association</u>. The Association shall have the powers of a Texas non-profit corporation, subject only to such limitations upon the exercise of such powers as are expressly set forth in this Declaration. It shall further have the power to do and perform any and all acts which may be necessary or proper for or incidental to the exercise of any of the express powers granted to it by the laws of Texas or by this Declaration. Without in any way limiting the generality of the two preceding sentences, the Association shall have the power and authority at all times as follows:

. . . .

(f) <u>Construction</u>. The Association may construct new Improvements in the Common Area as may be reasonably required to protect the value and desirability of the Property and subject to the approval of the Owner on whose Lot any such Improvements may be located, which approval shall not be unreasonably withheld or delayed.[20]

. . . .

4.02. <u>Purpose of Assessments</u>. The assessments levied by the Association will be used exclusively for protection of the health, safety and welfare of the Owners; the protection of the value and desirability of the Property; the operation, maintenance, repair, replacement, preservation and protection of the Common Area; and the performance of the functions of the Association pursuant to this Declaration.

. . . .

---

[20] Section 1.11 of the Amended CCRs defines "Improvement" as "every structure and all appurtenances thereto of every type and kind" along with a non-exclusive list of illustrative examples that includes wells, tanks, reservoirs, pipes, lines, and all facilities used in connection with utilities. The term "Property" is defined in section 1.15 to include all of the lots that the parties stipulated were part of the East Avenue Subdivision.

15

4.04    Special Assessments. If the Board, at any time, or from time to time, determines that the regular assessment for any year is insufficient to provide for the performance of the functions of the Association, or to provide for timely payment of its bills, or for the operation, maintenance, repair, [or] replacement of the Common Area for which the Association is responsible, then the Board shall have the authority to levy such special assessments as it shall deem necessary to provide for the same. . . . .

. . . .

9.13.    Approvals. In each instance where any . . . assessment, . . . expenditure . . . or any other act is granted, withheld, exercised, established, made, imposed or otherwise taken by any of the Declarant, the Association, the Board and/or the Architectural Committee pursuant to this Declaration, such . . . shall serve to protect the value and desirability of the Property and the health, safety and welfare of the Owners, [and] shall be non-discriminatory and applied consistently to all Owners (including Declarant) . . . .

Courts construe dedicatory instruments, like the Amended CCRs and the Bylaws, as any other contract. *See, e.g.*, *Marzo Club, LLC v. Columbia Lakes Homeowners Ass'n*, 325 S.W.3d 791, 798 (Tex. App.—Houston [14th Dist.] 2010, no pet.); *Mitchell v. LaFlamme*, 60 S.W.3d 123, 128 (Tex. App.—Houston [14th Dist.] 2000, no pet.); *Herbert v. Polly Ranch Homeowners Ass'n.*, 943 S.W.2d 906, 908 (Tex. App.—Houston [1st Dist.] 1996, no writ); *see also Pilarcik v. Emmons*, 966 S.W.2d 474, 478 (Tex. 1998) ("[R]estrictive covenants are subject to the general rules of contract construction."). A contract is unambiguous if, after appropriate rules of construction have been applied, the covenant can be given a definite or certain legal meaning. *Pilarcik*, 966 S.W.2d at 478. The interpretation of an unambiguous contract is a question of law for the court. *Moayedi v. Interstate 35/Chisam Rd., L.P.*, 438 S.W.3d 1, 7 (Tex. 2014).

In construing a written contract, we seek the true intentions of the parties as expressed in the instrument. *Balandran v. Safeco Ins. Co. of Am.*, 972 S.W.2d 738, 741 (Tex. 1998). We must

16

examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless. *Id.* Moreover, unless the agreement shows the parties used a term in a technical or different sense, the terms bear their plain, ordinary, and generally accepted meanings. *Moayedi*, 438 S.W.3d at 7.

While parol evidence of the parties' intent is not admissible to create an ambiguity, the contract may be read in light of the surrounding circumstances to determine whether an ambiguity exists. *Balandran*, 972 S.W.2d at 741. If, in the light of surrounding circumstances, the language of the contract appears to be capable of only a single meaning, the court can then confine itself to the writing. *Sun Oil Co. v. Madeley*, 626 S.W.2d 726, 731 (Tex. 1981); *see also Houston Exploration Co. v. Wellington Underwriting Agencies, Ltd.*, 352 S.W.3d 462, 469 n.25 (Tex. 2011). Consideration of the facts and circumstances surrounding the execution of a contract, however, is simply an aid in the construction of the contract's language. *Sun Oil*, 626 S.W.2d at 731. The rule that parol evidence is not admissible to create an ambiguity "'obtains even to the extent of prohibiting proof of circumstances surrounding the transaction when the instrument involved, by its terms, plainly and clearly discloses the intention of the parties, or is so worded that it is not fairly susceptible of more than one legal meaning or construction.'" *Id.* at 732 (quoting *Lewis v. East Tex. Fin. Co.*, 146 S.W.2d 977, 980 (1941)). Mere disagreement over the interpretation of an agreement does not necessarily render the contract ambiguous. *See City of Pasadena v. Gennedy*, 125 S.W.3d 687, 693 (Tex. App.—Houston [1st Dist.] 2003, pet. denied).

Both parties contend the Amended CCRs are unambiguous and can be construed as a matter of law; however, their interpretations of the language differ significantly. Among other

17

arguments, UP Austin asserts, and the trial court agreed, that the POA has no authority under the Amended CCRs to make a special assessment for the purpose of building initial infrastructure because:

- In accordance with section 9.13, no assessment can be made unless it would "serve to *protect* the value and desirability of the Property," and there is sufficient evidence that the intent, purpose, and effect of initial infrastructure is to *increase* property value. (Emphasis added.)

- In accordance with section 4.02, any assessment levied by the Association must be used exclusively for limited purposes, including "protection of the value and desirability of the Property" and "performance of the functions of the Association pursuant to the CCRs," but (1) initial infrastructure creates value; (2) the term "functions," given its plain meaning and used in context, refers to the POA's duties, not its powers; and (3) the POA is *empowered* by the CCRs to do some new construction but may only make an assessment if such construction is in discharge of one of the POA's duties under section 3.06 of the CCRs, none of which fairly includes construction of initial subdivision infrastructure within its scope.[21] Construing the Amended CCRs to limit the POA's assessment authority to its duties is consistent with the Bylaws, which state that "the [POA] may *only* levy Assessments (regular or special) to defray costs which are incurred in furtherance of the *duties* of the Association [under law or the dedicatory instruments]." (Emphasis added.)

- Section 4.04, in relevant part, constrains the POA's special-assessment authority to performance of the POA's "functions" (which is limited to its duties not its powers);

---

[21] The POA duties prescribed by section 3.06 of the Amended CCRs include: (1) operation and control of common areas, including improvements located in the common area; (2) repair and maintenance of the common area; (3) payment of all property taxes and other assessments levied on the common areas; (4) payment of all reasonable charges for utilities, maintenance, repair, landscaping, gardening, garbage removal, security, and other services used in connection with operation and maintenance of the common area; (5) levy and collect assessments to provide for the operation, maintenance, repair, replacement, preservation, and protection of the common area; (6) levy and collect assessments as necessary to perform the POA's functions; (7) obtain and maintain policies of insurance adequate to carry out the POA's functions; (8) removal and appointment of Architectural Committee members after expiration of the Declarant Control Period; (9) carry out and enforce the Declaration; and (10) keep records and books of the POA's affairs.

18

paying bills (which is not implicated here); and "operation, maintenance, repair, [or] replacement of the Common Area" (terms which do not reasonably include new construction of initial subdivision infrastructure).

- Even if the POA has authority under sections 4.02 or 4.04 to levy an assessment for new construction under section 3.07(f), the construction must be "reasonably required" "to protect the value and desirability of the Property" and located "in the Common Area"; in the present case, the evidence sufficiently established that the special assessment was for initial infrastructure work, which enhances, rather than maintains, the value of the property.[22]

- UP Austin's construction of the CCRs as not authorizing a special assessment for initial infrastructure is consistent with the circumstances existing when the document was created, at which point the obvious intent and plan for the development was for the original developer to construct the infrastructure, not the POA. The relevant provisions also were not changed when the Amended CCRs were adopted.

---

[22] Section 1.06 of the Amended CCRs defines "Common Area," which is distinguished from "Common Area Lots," as:

[A]ll ingress and egress easements, access easements, parking easements, drainage easements, water quality easements, landscaping easements, and public utility easements affecting any part of the Property, or referenced on the PUD, or conveyed to the Association by separate recorded instrument; together with all other Improvements of whatever kind and for whatever purpose which may be located in such areas, including, without limitation, stormwater detention ponds and water quality ponds serving the Property, common entryway Improvements, entryway signs and associated landscaping, irrigation systems for Common Area landscaping, any water wells on the Property, water recirculation machinery and systems associated with the Common Areas, and lighting systems associated with the Common Areas; and any other areas or Improvements for which the Association has duly accepted responsibility for operation and maintenance and which are intended for or devoted to the common use and enjoyment of the Owners.

Although many of the special-assessment projects would be located outside the subdivision's boundaries, the POA contends that the work is not unauthorized because the "Common Area" definition broadly encompasses offsite areas "affecting any part of the Property," "referenced on the PUD," "serving the Property," and "associated with the Common Areas." Our disposition of the case, however, obviates the need to address the POA's construction of section 1.06, and we therefore express no opinion as to that matter.

Although the parties agree that the dedicatory instruments were not enacted with the intent that the POA complete the initial subdivision infrastructure, the POA argues that the Amended CCRs' broad language grants it authority to make a special assessment for that purpose and that the Amended CCRs do not expressly prohibit it from doing so, as CCRs sometimes do. The POA's contrary interpretation of the relevant provisions of the Amended CCRs includes that: (1) "functions" must refer to both powers and duties, otherwise the POA would not be able to pay for any of the powers it has been expressly granted, rendering those provisions meaningless;[23] and (2) the POA has the power to construct new improvements in the common area and thus the discretion to determine which improvements to construct.[24] In short, the POA contends that it is not a question of the POA's authority to levy a special assessment for new construction, but rather a matter of the POA's discretion as to how to exercise the authority it has been granted in determining what assessments and construction are reasonably required "to protect the value and desirability of the Property." As to matters within the POA's discretion, it is afforded a statutory presumption of reasonableness. *See* Tex. Prop. Code § 202.004(a) ("An exercise of discretionary authority by a

---

[23] For example, in addition to authorizing the POA to construct new improvements in the common area, section 3.07 of the Amended CCRs empowers the POA to "retain and pay for" a person or firm to manage and operate the association, "retain and pay for" legal and accounting services, enter into contracts for some services, and obtain any and all types of permits and licenses.

[24] The POA further argues as a source of its authority that the Amended CCRs broadly grant it "the powers of a Texas non-profit Corporation," which by statute include the power to "acquire, receive, own, hold, improve, use, and deal in and with property or an interest in property," "make contracts and guarantees," and "take other action necessary or appropriate to further the purposes of the entity." Tex. Bus. Orgs. Code § 2.101(3), (5), (22). The Amended CCRs, however, circumscribe what might otherwise be an expansive grant of authority by the limitations on the POA's powers that are set forth in that document. Accordingly, the grant of authority the POA cites does not authorize it to circumvent the limitations in the Amended CCRs.

20

property owners' association . . . concerning a restrictive covenant is presumed reasonable unless the court determines by a preponderance of the evidence that the exercise of discretionary authority was arbitrary, capricious, or discriminatory."); *see also Marmic Props., L.L.C. v. Silverglen Town-Homes Homeowners' Ass'n*, No. 14-12-00312-CV, 2013 WL 4680492, at \*3 (Tex. App.—Houston [14th Dist.] Aug. 29, 2013, no pet.) (mem. op.) (statutory presumption applies to assessments). When such a presumption applies, the party opposing the discretionary act bears the burden of producing evidence to rebut the presumption. *Marmic*, 2013 WL 4680492, at \*3. The POA intimates that if it has any authority to make an assessment, it has discretion to determine what activities fall within the scope of its assessment authority. The trial court concluded that the issue concerned proper construction of the dedicatory instruments, not the POA's discretionary authority.

We agree with the parties and the trial court that the relevant language of the Amended CCRs is unambiguous; thus we will construe it as a matter of law. When so construed, we conclude that the POA was not authorized to make a special assessment to construct the initial infrastructure under the plain language of the Amended CCRs. Because the CCRs expressly constrain the POA's assessment authority, the threshold issue concerns the POA's authority rather than the exercise of its discretion.

Several terms pertinent to our construction of the CCRs are not specially defined. However, no special or technical meaning is evident from the document as a whole or from the circumstances surrounding its adoption; accordingly, we apply the plain meaning of the undefined terms. The trial court determined, and we agree, that construction designed and intended to create value and desirability does not meet the requirement that the construction be "reasonably required

21

to protect the value and desirability of the Property," under the plain and ordinary meaning of the term "protect." Accordingly, the POA has no discretion to assess for new construction that does not meet that express limitation on the POA's authority.

To this point, in addition to testimony from UP Austin's witnesses, the POA's corporate representative acknowledged that the purpose of initial subdivision infrastructure is to create rather than protect value, as that term is commonly understood and used in the Amended CCRs, and that the special-assessment projects were anticipated to enhance the property's value. Although there was some evidence of a potential adverse impact on property value if the site plans expire, the trial court was not required to credit that evidence to the exclusion of contrary evidence.

The POA appears to suggest that expiration of a site development plan (SDP) always equates to a loss of property value, and, thus, to avoid certain adverse impact on the property's value, the POA was required to take action to prevent the SDP from expiring when negotiations among the property owners stalled. For that proposition, the POA chiefly relies on *State v. Biggar*, 873 S.W.2d 11 (Tex. 1994), an inverse-condemnation case in which the Texas Supreme Court concluded that the State, with the objective of impairing a desired parcel's value, had intentionally denied a routine easement exchange to thwart development of the property under an SDP that required the easement exchange. *Id.* at 12-13. *Biggar*, however, does not support the broad proposition that expiration of an SDP necessarily reduces the value of property. In *Biggar*, it was undisputed that the SDP envisioned development of the entire tract; the tract could not be developed in the same way after the anticipated partial taking; the approved SDP itself therefore added value to the property because the taking would permanently alter what could be done with the property; and after the SDP expired

22

due to the State's denial of the easement exchange, the land's value decreased despite revival of the SDP because regulatory changes precluded the property from being developed to the same extent. *Id.* at 12-13 & n.5. In *Biggar*, there was no path to completing the original SDP without the easement exchange; as a result, the land's value decreased drastically when the original SDP expired and could not be resurrected to enable the same degree of development. *Id.* *Biggar* essentially stands for the proposition that *foreclosing* the anticipated development caused an *undisputed reduction* in the value of the property. *See id.* at 14 (evidence established that State used its discretion to deny the easement "to *preclude* development in order to *reduce* the value of the tract" (emphasis added)).

Biggar* is distinguishable from the present case because there is no evidence here that expiration of the site plans would *permanently* impede development of the property. There is only evidence of time and cost increases to revive approval; the possibility of a permanent loss of site entitlements and grandfathering, the impact of which was speculative as to a loss in the property's value; and a necessary adverse impact on property value *if* there were no clear path to re-entitling the property. This evidence neither conclusively establishes that completing initial subdivision infrastructure under University Park's approved site plans served to "*protect* the value and desirability of the Property" nor negates evidence that the purpose, intent, effect, and expectation of constructing that infrastructure was to *enhance* the value of the property. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241-42 (Tex. 2001) (articulating evidence-sufficiency standards).

In sum, we conclude that (1) the Amended CCRs unambiguously limit the POA's construction authority—and thus any related assessment authority—to activities reasonably required

to protect the value and desirability of the property, and (2) the record supports the trial court's determination that the purpose of constructing initial subdivision infrastructure—generally and as expected in this case—is to create rather than protect the value and desirability of property. Accordingly, the trial court did not err in invalidating the special assessment on that basis. We therefore need not consider the trial court's other factual and legal bases for invalidating the special assessment. *See* Tex. R. App. P. 47.1.

## B. Minority Oppression

The relief afforded in the judgment against the Owners is based on the trial court's legal and factual determinations pertaining to UP Austin's minority-oppression claim. The trial court held the Owners liable to UP Austin for minority oppression based on (1) the Owners' approval of the POA's special assessment, which the court found oppressive for a number of reasons, and (2) the Owner Declarant's enactment of the second- and third- amended CCRs.[25] Based on these findings, the trial court invalidated the second- and third-amended CCRs and entered a permanent injunction prohibiting further similar amendments. Having granted the foregoing relief, the court denied UP Austin's request for appointment of a receiver for the POA under section 11.404 of the

---

[25] The trial court found that

> [n]either the Second Amendment nor the Third Amendment serves to protect the value and desirability of University Park or the health, safety, and welfare of the property owners, and they are both oppressive to owners not affiliated with Cypress. In addition, the Second Amendment and Third Amendment are burdensome and harsh to UP Austin and other owners not affiliated with Cypress, they substantially defeat the objectively reasonable expectations that were central to UP Austin's decision to acquire the property, and their implementation is contrary to good faith and fair dealing to the prejudice of UP Austin.

24

Texas Business Organizations Code as unnecessary. *See* Tex. Bus. Orgs. Code § 11.404(b)(3) (court may appoint receiver only if other available legal and equitable remedies are inadequate).

In *Ritchie v. Rupe*, the Texas Supreme Court recently held that there is no common law cause of action for minority oppression in Texas and that the only remedy for oppressive conduct is appointment of a receiver under section 11.404, if the statutory requirements are satisfied. 443 S.W.3d 856, 887, 891 (Tex. 2014) ("We . . . decline to recognize a common-law cause of action for 'shareholder oppression.'"); *see also Cardiac Perfusion Servs., Inc. v. Hughes*, 436 S.W.3d 790, 791 (Tex. 2014) (observing that in *Ritchie*, the court had "declined to recognize a common-law cause of action for shareholder oppression and concluded that the only statutory remedy for 'oppressive' actions is a rehabilitative receivership").

UP Austin contends that we may not consider *Ritchie*'s impact on this case because the Owners waived any argument that minority oppression is not a valid common-law cause of action by failing to preserve that claim in this Court or the trial court. On appeal, the Owners have challenged (1) the legal- and factual-sufficiency of the evidence to support the minority-oppression findings and conclusions and (2) the sufficiency of UP Austin's pleadings to support the relief afforded on the basis of that claim. "When the applicable law changes during the pendency of the appeal, the court of appeals must render its decision in light of the change in law." *Blair v. Fletcher*, 849 S.W.2d 344, 345 (Tex. 1993). To the extent that principle applies only to legal challenges that have properly been preserved, we conclude that the Owners' legal-sufficiency challenges, which may be raised for the first time on appeal from a judgment following a non-jury trial, are adequate to preserve the argument that the trial court's judgment against them was based on an invalid

25

legal theory. *See* Tex. R. App. P. 33.1(d) ("In a nonjury case, a complaint regarding legal or factual insufficiency of the evidence . . . may be made for the first time on appeal in the complaining party's brief."); *Holland v. Wal-Mart Stores, Inc.*, 1 S.W.3d 91, 95 (Tex. 1999) (defendant sufficiently preserved argument that attorney's fees were not available under applicable statute by asserting nonrecovery in motion for j.n.o.v. because such method is appropriate to preserve legal-sufficiency challenges and claim of nonrecoverability was analogous to legal-sufficiency challenge for error-preservation purposes); *Martinez v. English*, 267 S.W.3d 521, 550 n.6 (Tex. App.—Austin 2008, pet. denied) (no-evidence challenge preserved argument that cause of action was unavailable as matter of law).

Applying *Ritchie*, we reverse the trial court's judgment against the Owners, which is based on an invalid legal theory, and render judgment that the Owners are not liable for minority oppression as alleged.[26] We therefore vacate the permanent injunction and the portion of the judgment nullifying the second- and third-amended CCRs. We remand to the trial court UP Austin's claim for appointment of a receiver for the POA, which was denied based on the availability of the preceding remedies.[27]

---

[26] Because minority oppression does not support the relief the trial court awarded as a matter of law, the court's related findings of fact are immaterial. We therefore do not reach the Owners' challenges to the legal- and factual-sufficiency of the evidence to support those findings.

[27] We decline UP Austin's request that we exercise our discretion to remand "in the interest of justice" for it to pursue unspecified alternative claims against the Owners in light of *Ritchie*'s change in the law. *See Cardiac Perfusion Servs., Inc. v. Hughes*, 436 S.W.3d 790, 792 (Tex. 2014) (remanding for opportunity to pursue derivative action for breach of fiduciary duties). UP Austin has not identified any potentially applicable alternative claims nor explained why it was foreclosed from bringing any such claims by the presumed availability of relief under a minority-oppression theory. The interests of justice are not served by a remand for an unspecified second bite at the apple.

## C.    Unjust Enrichment

Although supporting the POA's authority to levy the special assessment, the Owners filed a cross-claim against the POA under various theories seeking reimbursement of their assessment payments in the event the assessment were held to be invalid. The POA did not answer or contest the restitution claim. The trial court, however, generally denied the cross-claim as "collusive in that it impermissibly realigns the [Owners] with UP Austin against, in essence themselves (the Cypress-controlled POA)." The Owners appeal only the denial of their unjust-enrichment theory of restitution, which the trial court denied on the basis that they "failed to show that the POA 'wrongfully secured a benefit or . . . passively received one which it would be unconscionable for [it] to retain.'" (Alteration in original.)

"Unjust enrichment is not an independent cause of action; however, an action for restitution based on unjust enrichment will lie 'to recover money received on a consideration that has failed in whole or in part.'" *Oxford Fin. Cos., Inc. v. Velez*, 807 S.W.2d 460, 465 (Tex. App.—Austin 1991, writ denied). A party seeking restitution "must show not only that the party from whom he is seeking restitution was unjustly enriched, but also that that party 'had wrongfully secured a benefit or had passively received one which it would be unconscionable for him to retain.'" *Id.* Importantly, "a party's right to recover under a theory of unjust enrichment does not depend on the other party's commission of a wrongful act." *Id.*

Because a wrongful act is not required for restitution, the Owners merely had the burden to establish that (1) they paid money to the POA, (2) the purpose of the payment failed in

27

whole or part, and (3) it would be unconscionable for the POA to retain the money.[28] *See id.* It is undisputed that the Owners paid the amounts levied on their property for the special assessment and that the Owner Declarant also paid the portion of the special assessment allocated to the townhome owners. The trial court found that the POA lacked the authority to make a special assessment to complete initial subdivision infrastructure and that the assessment was therefore void ab initio. We have now affirmed that holding. The only issue, therefore, is whether it would be "unconscionable" for the POA to retain funds paid for an assessment that has been void since its inception.

We conclude that, as a matter of law, it would be unconscionable for the POA to retain the Owners' special-assessment payments, which were not only levied without legal authority but which were also made to secure work that the POA is unable to complete as a matter of law and fact. Although UP Austin contends that allowing the Owners to obtain restitution of an assessment they implemented with their votes and "control" over the POA would permit the Owners to hedge their bets and "to abuse the trial process," there is nothing inconsistent about the Owners' complementary legal positions that the POA had authority under the Amended CCRs to make

---

[28] The voluntary-payment rule, which is an affirmative defense to a restitution claim for unjust enrichment, was not asserted in a responsive pleading by any party or addressed by any party, except by UP Austin in response to the Owners' motion for judgment. The defense, to the extent otherwise applicable, is therefore waived. *See Berryman's South Fork, Inc. v. J. Baxter Brinkmann Int'l Corp.*, 418 S.W.3d 172, 188-89 (Tex. App.—Dallas 2013, pet. denied) (affirming summary judgment on claim for money had and received where voluntary-payment rule was not asserted as defense nor addressed in summary-judgment response). Under the voluntary-payment rule, "'[m]oney voluntarily paid on a claim of right, with full knowledge of all the facts, in the absence of fraud deception, duress, or compulsion, cannot be recovered back merely because the party at the time of payment was ignorant of or mistook the law as to his liability.'" *BMG Direct Mktg., Inc. v. Peake*, 178 S.W.3d 763, 768 (Tex. 2005) (quoting *Pennell v. United Ins. Co.*, 243 S.W.2d 572, 576 (Tex. 1951)). The voluntary-payment rule does not bar restitution based on mutual mistake of fact. *See id.*

28

the special assessment, but if it did not, the Owners' had no obligation to pay it, especially when the expectation of its purpose has failed in its entirety. Accordingly, we reverse the trial court's judgment denying the Owners' unjust-enrichment cross-claim and render judgment awarding the Owners restitution of the sums they paid pursuant to the void special assessment.

## D. Attorney's Fees

The remaining issues on appeal, broadly stated are: (1) whether UP Austin is entitled to recover its prejudgment attorney's fees and expenses from the POA and the Owners as a matter of law; (2) whether UP Austin sufficiently segregated and otherwise established that the amount of fees it requested was reasonable; (3) whether the Owners are entitled to recover their attorney's fees from UP Austin as a matter of law; and (4) whether the judgment awarding conditional post-judgment and appellate attorney's fees to UP Austin is defective in failing to clearly identify the parties liable for those fees.[29]

The trial court concluded that UP Austin was the prevailing party on the threshold declaratory-judgment claim, that the POA was not the prevailing party on that claim, and that the Owners were not the prevailing party on that claim because they approved the special assessment through their control of the POA. Based on the latter two findings, the trial court denied the POA's and the Owners' counterclaims for attorney's fees. The trial court also denied UP Austin's claim to recover prejudgment attorney's fees on the basis that (1) UP Austin prevailed on some of its claims against the POA and the Owners, but not others; (2) not all of the claims authorized an award

---

[29] The POA also appealed the denial of its claim for attorney's fees, but effectively concedes that it cannot recover on that claim if we conclude, as we have, that the special assessment is void.

29

of attorney's fees; (3) UP Austin's prejudgment attorney's fees could be segregated because not all legal tasks on each claim were inextricably intertwined; (4) UP Austin willfully failed to segregate attorney's fees despite numerous requests and opportunities to do so; and (5) UP Austin failed to present competent evidence that its attorney's fees were reasonable and necessary. Although declining to award prejudgment attorney's fees, the trial court did award UP Austin conditional post-judgment and appellate attorney's fees. The parties are uniformly dissatisfied with the disposition of the claims for attorney's fees. We address their arguments in turn.

UP Austin challenges the trial court's denial of its claim for prejudgment attorney's fees and opposes the Owners' and the POA's counterclaims for their attorney's fees, contending it was the "prevailing party" on the "main issue" in the case, which was to invalidate the POA's special assessment. *See Old HH, Ltd. v. Henderson*, 03-10-00129-CV, 2011 WL 6118570, at *3 (Tex. App.—Austin Dec. 9, 2011, no pet.) (mem. op.) ("prevailing party" refers to "'the party who successfully prosecutes the action or defends against it, prevailing on the main issue, even though not to the extent of its original contention'" (quoting *Johns v. Ram Forwarding, Inc.*, 29 S.W.3d 635, 637-38 (Tex. App.—Houston [1st Dist.] 2000, no pet.))). UP Austin asserts that, as a matter of law, it is entitled to recover more than $1.7 million in prejudgment attorney's fees and $37,606.56 in expenses and was not required to segregate its fees among parties and claims as long as it prevailed on the "main issue" in the litigation. In essence, UP Austin aggregates all of its attorney's fees under the umbrella of its claim against the POA to invalidate the special assessment and asserts that

segregation is not required as to any other claim or party.[30]  In the alternative, if segregation was required, UP Austin contends that the appropriate remedy is not the denial of all fees but remand to the trial court for segregation.  UP Austin also challenges the zero attorney-fee award on evidence-sufficiency grounds.

Texas law prohibits recovery of attorney's fees unless authorized by statute or contract.  *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 310 (Tex. 2006).  Even when attorney's fees are recoverable, the general rule is that a party seeking to recover attorney's fees in a suit involving multiple claims or parties has a duty to segregate recoverable and unrecoverable fees. *Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 10-11 (Tex. 1991); *see also Varner v. Cardenas*, 218 S.W.3d 68, 69 (Tex. 2007) ("[A] prevailing party must segregate recoverable from unrecoverable attorney's fees in all cases."); *Tony Gullo*, 212 S.W.3d at 313 (reaffirming "the rule that if any attorney's fees relate solely to a claim for which such fees are unrecoverable, a claimant must segregate recoverable from unrecoverable fees").  A recognized exception to the duty to segregate arises when discrete legal services advance both a recoverable and unrecoverable claim and thus are so intertwined that they need not be segregated.[31]  *Tony Gullo,* 212 S.W.3d at 313.

---

[30]  UP Austin does not contend that its attorney's fees could not be segregated; it asserts only that it was under no obligation to do so because all of the claims were related to the special-assessment issue, which arose under the Amended CCRs.

[31]  Fees incurred to prosecute or defend claims for which attorney's fees are otherwise unrecoverable may nevertheless be recovered if prosecution or defense of those claims was necessary for the party to prevail on a claim for which attorney's fees are authorized.  *See Varner v. Cardenas*, 218 S.W.3d 68, 69 (Tex. 2007).  This exception is not implicated in the circumstances presented.

In the present case, both statutory and contractual provisions are at issue: section 5.006 of the Texas Property Code and section 9.01 of the Amended CCRs.[32] The Owners contend, however, that neither provision authorizes UP Austin's recovery of attorney's fees from them because (1) UP Austin did not recover on any claim against them that qualifies under either provision, and (2) given the reversal of the relief that had been awarded against them under a minority-oppression theory, UP Austin did not prevail on any claim against them at all.

Section 5.006(a) of the Texas Property Code provides that "[i]n an action based on breach of a restrictive covenant pertaining to real property, the court shall allow a prevailing party who asserted the action reasonable attorney's fees in addition to the party's costs and claim." Tex. Prop. Code § 5.006. An award under section 5.006 is mandatory for a qualifying claim, but the amount awarded must be reasonable. *Gorman v. Countrywood Prop. Owners Ass'n*, 1 S.W.3d 915, 918 (Tex. App.—Beaumont 1999, pet. denied). UP Austin contends that it is not required to segregate its fees because section 5.006 applies to the *entire* "action" that is "based on" breach of a restrictive covenant, regardless of whether a party prevails on all the claims or whether all of the claims actually involve breach of a restrictive covenant. In UP Austin's view of section 5.006(a), all that is required for it to recover 100% of its attorney's fees for the prosecution of all claims

_____

[32] The Texas Declaratory Judgments Act also authorizes an award of attorney's fees, but the trial court has discretion under that statute to determine whether it is "equitable and just" to award such fees. Tex. Civ. Prac. & Rem. Code § 37.009 ("In any proceeding under this chapter, the court may award costs and reasonable and necessary attorney's fees as are equitable and just."); *Bocquet v. Herring*, 972 S.W.2d 19, 20 (Tex. 1998) (declaratory judgment statute does not require award of attorney's fee and thus affords trial court discretion in making award). Here, the trial court determined that it was "equitable and just for each party to bear its own attorney's fees in the trial court," and the parties do not challenge this determination.

against all parties is the assertion of and recovery on any qualifying claim, as long as that claim was the "main issue" of the litigation.

Section 9.01 of the Amended CCRs also includes an attorney's fee provision, which provides, in relevant part:

> Declarant, the Association, or any Owner shall have the right to enforce, by proceeding, at law or in equity, for damages or for injunction or both, all restrictions, covenants, conditions, rights and duties imposed, allowed or granted by the provisions of this Declaration. In any such proceeding, *the prevailing parties shall be entitled to recover costs and expenses, including reasonable attorney's fees*.

(Emphasis added.) As worded, section 9.01 is not discretionary as to an award of attorney's fees for a qualifying claim, but is likewise subject to a reasonableness limitation. *Cf. Bocquet v. Herring*, 972 S.W.2d 19, 20 (Tex. 1998) ("Statutes providing that a party 'may recover', 'shall be awarded', or 'is entitled to' attorney fees are not discretionary."). UP Austin similarly contends that it is under no obligation to segregate attorney's fees because section 9.01 provides for mandatory attorney's fees for an entire lawsuit ("proceeding") if it involves a claim "to enforce" any provision in the Amended CCRs. Because UP Austin successfully challenged the special assessment, it contends that it is the prevailing party on the main issue in the case, and as such, it can recover all of its attorney's fees without segregation—even as to fees incurred to prosecute claims on which it did not prevail and on claims that do not require the same elements, research, discovery, proof, or legal expertise as a claim to enforce the Amended CCRs.

Whether the claims at issue fall within the meaning of the applicable statutory and contract provisions and whether attorney's fees must be segregated are questions of law. *See, e.g.*,

33

*Moayedi*, 438 S.W.3d at 7 (interpretation of unambiguous contract is question of law); *Jaster v. Comet II Constr., Inc.*, 438 S.W.3d 556, 562 (Tex. 2014) (statutory construction is question of law); *Tony Gullo*, 212 S.W.3d at 312 (need to segregate attorney's fees is question of law). The extent to which certain claims and fees are capable of being segregated is a mixed question of law and fact. *Tony Gullo*, 212 S.W.3d at 312. In comparison, the reasonableness of attorney's fees is a question of fact. *Bocquet*, 972 S.W.2d at 20. Thus, although the granting of attorney's fees is mandatory upon a showing of entitlement, the amount of such fees is within the trial court's discretion. We will not disturb a trial court's award of attorney's fees absent an abuse of discretion. *See, e.g.*, *Roth v. JPMorgan Chase Bank, N.A.*, 439 S.W.3d 508, 514 (Tex. App.—El Paso 2014, no pet.).

As an initial matter, we do not agree that either section 5.006 or section 9.01 can be read to suggest that a party can recover attorney's fees on any claim against any party merely because it is asserted in an action or proceeding in which enforcement of a restrictive covenant is at issue. When interpreting a contractual or statutory attorney's fee provision in which the "prevailing party" term is left undefined, as is the case here, we presume the term bears its ordinary meaning. *Intercontinental Grp. P'ship v. KB Home Lone Star L.P.*, 295 S.W.3d 650, 653 (Tex. 2009). In that regard,

> [t]o qualify as a prevailing party, a . . . plaintiff must obtain at least some relief on the merits of his claim. The plaintiff must obtain an enforceable judgment *against the defendant from whom fees are sought*, or comparable relief through a consent decree or settlement. Whatever relief the plaintiff secures must directly benefit him at the time of the judgment or settlement. Otherwise the judgment or settlement cannot be said to affect the behavior of the defendant toward the plaintiff. . . . In short, a plaintiff "prevails" when actual relief on the merits of his claim *materially alters the*

34

> *legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff.*

*Id.* at 654 (quoting *Farrar v. Hobby*, 506 U.S. 103, 111-12 (1992) (internal citations omitted) (emphases added)). "[T]he plaintiff is required to prove the fees that were incurred against the particular defendant sought to be charged with said fees." *Koch Oil Co. v. Wilber*, 895 S.W.2d 854, 867 (Tex. App.—Beaumont 1995, writ denied). This is required to ensure that the parties from whom attorney's fees are sought are not charged fees for which they are not responsible. *See Sterling*, 822 S.W.2d at 10-11. To hold otherwise would contravene the general rule that attorney's fees are not available unless authorized by statute or contract.

Aggregating claims against multiple parties does not transform claims for which attorney's fees would otherwise be unrecoverable into claims for recoverable fees by their mere association with a claim for which attorney's fees are authorized. Identifying the "main issue" may help identify a "prevailing party"—i.e., *who* can recover attorney's fees—but when recovery against multiple parties and on multiple claims is a mixed bag, the prevailing party remains obligated to segregate fees associated with claims and parties for which attorney's fees are not authorized—i.e., *what* fees can be recovered remains an issue. The "in for a penny, in for a pound" standard UP Austin advocates is fundamentally at odds with well-established fee-shifting limitations and fee-segregation principles. *See Tony Gullo*, 212 S.W.3d at 313 (eliminating exception for attorney's fees incurred solely on separate but arguably intertwined claims; mere commonality of underlying facts does not necessarily make all claims arising therefrom "inseparable" and all legal fees recoverable); *DMC Valley Ranch, L.L.C. v. HPSC, Inc.*, 315 S.W.3d 898, 906

35

(Tex. App.—Dallas 2010, no pet.) ("'A party seeking attorney fees has a duty to segregate nonrecoverable fees from recoverable fees, *and to segregate the fees owed by different parties*." (emphasis in original) (quoting *Fench v. Moore*, 169 S.W.3d 1, 17 (Tex. App.—Houston [1st Dist.] 2004, no pet.)). Unless otherwise nonrecoverable claims are *necessary* to obtain all relief on a covered claim, which is not the case here, a prevailing party must segregate recoverable from unrecoverable attorney's fees "in all cases." *Varner*, 218 S.W.3d at 69 (affirming denial of attorney fees incurred to pursue related claims against third party, but concluding that attorney's fees for defending counterclaim need not be segregated because plaintiffs were required to successfully defend that claim to fully recover on claim for which attorney's fees were authorized).

To the extent UP Austin relies on the breadth of the terms "an action" and "based on" that are used in section 5.006, an award of attorney's fees must be provided by the express terms of the statute in question and may not be supplied by implication. *See Holland v. Wal–Mart Stores, Inc.*, 1 S.W.3d 91, 95 (Tex.1999); *cf. Owens v. Ousey*, 241 S.W.3d 124, 134 (Tex. App.—Austin 2007, pet. denied) (requiring segregation of fees when plaintiff prevailed on one claim under section 5.006 but not on other claim under same statute); *Freedman v. Briarcroft Prop. Owners, Inc.*, 776 S.W.2d 212, 218 (Tex. App.—Houston [14th Dist.] 1989, writ denied) (party who brought action under section 5.006 for breach of deed restrictions, but did not prevail on that claim, could not recover attorney's fees for successful prosecution of related nuisance claim because that claim was not based in whole or in part on breach of restrictive covenant); *cf. also Radney v. Clear Lake Forest Cmty. Ass'n*, 681 S.W.2d 191, 199 (Tex. App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.) (allowing recovery of attorney's fees on fraudulent conveyance claim because "in order to obtain

the complete relief to which they were entitled because of the breach [of the restrictive covenant], it was necessary for appellees to have the fraudulent conveyance voided"). The same principle, although not strictly applicable to contracts, informs our reading of the Amended CCRs. It is unreasonable to construe section 9.01 to reach beyond its context to authorize fees that merely bear some relationship to the stated purpose of the provision. *Cf. MRO Sw., Inc. v. Target Corp.*, No. 04-07-00078-CV, 2007 WL 4403912, at *2-3 (Tex. App.—San Antonio Dec. 19, 2007, pet. denied) (mem. op.) (plaintiff not entitled to recover attorney's fees under contract provision authorizing party prevailing in "any legal action or proceeding to enforce any terms of this Agreement [or damages for its alleged breach]"; plaintiff prevailed on one claim that did not meet requirements for recovery and failed to prevail on only claim that did). Both section 5.006 and section 9.01 provide narrow exceptions to the rule prohibiting attorney-fee shifting and do not authorize a recovery for claims that do not meet their terms even if those claims are asserted in the same action or proceeding as ones that could or do.

UP Austin clearly prevailed on its claim against the POA and obtained a declaration that the special assessment was not authorized under the Amended CCRs, and an award of attorney's fees is mandatory for that claim under section 5.006 of the Property Code and section 9.01 of the Amended CCRs. UP Austin was nevertheless required to segregate its fees and expenses because (1) some attorney's fees were incurred analyzing theories and claims that were not applicable to any defendant and others were not applicable to all of the defendants; (2) the claims asserted against the defendants varied; (3) UP Austin did not prevail on all the claims asserted; (4) neither section 5.006 nor section 9.01 authorizes attorney's fees for all of the claims on which UP Austin prevailed;

37

and (5) the trial court's determination that the fees on the disparate claims could be segregated is unchallenged. UP Austin failed to segregate, however, even after the trial court repeatedly admonished it that the foregoing circumstances were likely impediments to a full fee award.[33]

However willful and ill-considered the refusal to segregate was, the remedy for such failure is not an award of zero attorney's fees, because evidence of unsegregated attorney's fees for the entire case is some evidence of what the segregated amount should be. *Tony Gullo*, 212 S.W.3d at 314. Accordingly, the supreme court has held that the appropriate remedy for failure or refusal to segregate attorney's fees is remand for segregation.[34] *See, e.g.*, *id.*; *Sterling*, 822 S.W.2d at 11-12 (concluding that remand is appropriate "[i]f a party refuses, over objection, to offer evidence segregating attorney's fees among various claims or parties, and an appellate court determines that segregation was required"); *see also DaimlerChrysler Motors Co., LLC v. Manuel*, 362 S.W.3d 160, 197-98 (Tex. App.—Fort Worth 2012, no pet.) (reversing zero attorney's fee award after bench trial based on failure to segregate and remanding for evidence of segregated amount of reasonable and necessary attorney's fees); *compare Dilston House Condo. Ass'n v. White*, 230 S.W.3d 714, 718

---

[33] At trial, UP Austin's counsel explained that no effort had been made to segregate as to individual claims and causes of action "because in the end, everything related to the CCRs" and the owner defendants had all voted for the special assessment, which was the subject of UP Austin's claim against the POA under the Amended CCRs. Although the Owner Declarant had enough votes to pass the special assessment without CAA's or Hospitality's votes, UP Austin's counsel explained that their litigation positions were essentially the same as the Owner Declarant's and, as a result, there were no segregable expenses attributable to only those entities.

[34] The total denial of attorney's fees appears more in the nature of a sanction. No issue concerning the propriety of sanctions is properly presented on appeal; accordingly, we express no opinion as to whether willful refusal to segregate attorney's fees would be sanctionable conduct.

(Tex. App—Houston [14th Dist.] 2007, no pet.) (affirming total denial of attorney's fees due to complete absence of evidence regarding attorney's fees incurred).

In addition to complaining about the lack of segregation between recoverable and unrecoverable fees and expenses, the POA and the Owners objected that UP Austin's attorney-fee rates and attorney staffing were unreasonable and excessive. The trial court agreed and found that UP Austin

> failed to present competent evidence that the hourly rates charged by their attorneys in this matter were reasonable for lawyers in Travis County given the nature of the case. [UP Austin's] counsel testified that a committee at his firm set the rates, but did not present testimony concerning prevailing rates for similar work in Travis County or testimony that the rates set by the committee were reasonable in comparison to rates charged by other counsel with similar skill and experience for similar work in Travis County.

The record supports this finding. There is also evidence that UP Austin's attorney's fees and expenses were more than twice the fees for the POA's and the Owners' attorneys and that the rates UP Austin's counsel charged and the case staffing were excessive for similar cases being prosecuted in Travis County, Texas.

Even so, the trial court's finding does not support an attorney's fee award of zero. Although the trial court could have rationally concluded that reasonable attorney's fees and expenses were less than the $1.8 million UP Austin seeks, "an award of no fees was improper in the absence of evidence affirmatively showing that no attorney's services were needed or that any services provided were of no value." *Midland W. Bldg. L.L.C. v. First Serv. Air Conditioning Contractors, Inc.*, 300 S.W.3d 738, 740 (Tex. 2009). Because there is no evidence to support an award of zero

attorney's fees and some evidence that fees were incurred, we remand the case to the trial court to determine a reasonable amount of fees.[35] *Id.*

On remand, the trial court must also determine whether UP Austin prevailed on claims against the Owners for which attorney's fees are recoverable. The Owners contend there are none and that they should be awarded their attorney's fees in the amount of $358,472.33 as a matter of law under section 9.01.[36] UP Austin asserts that it remains a prevailing party with respect to the Owners because it obtained comparable relief by virtue of a Rule 11 agreement that was substantially completed before the trial court ruled that it could not be enforced by specific performance. A plaintiff may be considered the prevailing party if it has secured a direct benefit by virtue of a settlement that modified the defendant's behavior in a way that directly benefits the plaintiff. *KB Home*, 295 S.W.3d at 654. The trial court here did not pass on this argument. The trial court's finding that the Rule 11 agreement was not enforceable by specific performance and was conditioned on a reservation of the right to seek reimbursement after performance is not dispositive of whether UP Austin secured a benefit at the time of the agreement. Due to this outstanding issue, which potentially impacts the prevailing-party analysis, and in light of our disposition of UP Austin's minority-oppression claim, we believe it is prudent to remand to the trial court for a prevailing-party

---

[35] On remand, the trial court is free to consider the POA's argument that a zero fee award is appropriate in light of evidence that UP Austin sued after refusing to engage in meaningful pre-suit negotiations. The trial court issued no findings of fact and conclusions of law as to this contention, and none can be presumed.

[36] Section 5.006 authorizes an award of attorney's fees only to the prevailing party "who asserted the action" for breach of a restrictive covenant pertaining to real property, not one who prevailed in defense of such an action. *See* Tex. Prop. Code § 5.006.

40

determination as to UP Austin's claims against the Owners under the applicable attorney's fee provisions as we have construed them.

The sole remaining challenge to the trial court's judgment concerns the award of conditional post-judgment and appellate attorney's fees, which the POA contends is invalid because the judgment lacks sufficient specificity as to which parties are liable for those fees. We agree.

We cannot affirm the award of appellate attorney's fees because that portion of the judgment fails to identify what party (or parties) the fees are awarded against.[37] The Texas Rules of Civil Procedure require that "the entry of the judgment shall contain the full names of the parties . . . for and against whom the judgment is rendered." Tex. R. Civ. P. 306 (emphasis added); *see City of Austin v. Castillo*, 25 S.W.3d 309, 314-15 (Tex. App.—Austin 2000, pet. denied) (trial court's judgment defective because it failed to dispose of named plaintiff's claim and awarded relief to one not named as plaintiff). In light of multiple trial-court findings to the effect that the POA and the Owners were under common control and acted together to improperly levy the special assessment,

---

[37] The judgment states:

> UP Austin shall recover the following conditional awards of attorneys' fees: (a) $15,000.00 for any post-judgment motion or request for findings of fact and conclusions of law filed by a defendant; (b) $90,000.00 if any defendant files a notice of appeal and does not prevail in such appeal; (c) $25,000.00 if any defendant files a petition for review in the Supreme Court of Texas and the Court dismisses or denies the petition without requesting briefs on the merits; (d) $30,000.00 if the Supreme Court of Texas requests merits briefs and the petitioning defendant does not prevail in such further appeal; and (e) $15,000.00 if the Supreme Court grants the petition for review and hears oral argument, and the petitioning defendant does not prevail in such further appeal.

The judgment does not differentiate among the individual parties with regard to liability for the attorney's fees conditionally awarded or expressly impose joint and several liability for the award.

41

we might infer that the trial court intended to impose joint and several liability for attorney's fees against them. However, there are several reasons why it would be inappropriate to construe the judgment in that way. First, the judgment expressly imposes joint and several liability against the POA and the Owners for UP Austin's costs of court. The absence of similar language with regard to the attorney-fee award suggests that the trial court did not intend to impose joint and several liability for post-judgment and appellate attorney's fees. Second, it is error to award appellate attorney's fees jointly and severally against multiple parties even if only one of them pursues an unsuccessful appeal. *Zurita v. SVH-1 Partners, Ltd.*, No. 03-10-00650-CV, 2011 WL 6118573, at *10 (Tex. App.—Austin Dec. 8, 2011, pet. denied) (mem. op.).

Ultimately, however, we cannot ascertain with any degree of certainty against whom the award was intended aside from pure speculation. *Cf. Ex parte Acker*, 949 S.W.2d 314, 317 (Tex. 1997) (holding that "decree must set forth the obligation in clear, specific and unambiguous terms"). UP Austin asserts that the award for post-judgment and appellate attorney's fees is conditioned on which party appeals and the result of that appeal; thus, the judgment need not have listed which party would be responsible for attorney's fees in which instance. We do not agree that the judgment can be so clearly construed. The judgment may reasonably be construed as imposing joint and several liability for the amounts stated or, under UP Austin's construction, the amounts stated multiplied by the number of parties appealing. Furthermore, the transcript of the hearing on attorney's fees suggests that the possible intent was to treat CAA, Hospitality, and the Owner Declarant collectively, but separately from the POA for purposes of liability for the amounts stated in the judgment, which would also be consistent with the trial court's findings. Because there

are a number of ways the judgment could be construed, the judgment lacks the specificity required for enforcement. Accordingly, it is necessary to remand for clarification of the judgment. Even if the trial court intended to impose joint and several liability or we could presume the same, we conclude that our disposition of the minority-oppression issue, the related remand for reconsideration of UP Austin's receivership request, and residual issues impacting the prevailing-party analysis support reversing the award of post-judgment and appellate attorney's fees and remanding that matter to the trial court for clarification.

## CONCLUSION

We conclude that the POA did not have authority under its dedicatory instruments to levy a special assessment to pay for initial infrastructure; accordingly, we affirm that portion of the trial court's judgment as well as the portion denying the POA's counterclaims for payment of the special assessment and recovery of attorney's fees. We further hold that the Owners cannot be held liable for minority oppression on the bases found by the trial court and, therefore, reverse the trial court's judgment invalidating the second- and third-amended CCRs and enjoining the Owner Declarant from amending the CCRs in the same manner in the future; we render judgment that UP Austin take nothing on its minority-oppression claim. We likewise reverse the trial court's judgment denying the Owners' unjust-enrichment claims and render judgment that the POA shall refund the amounts the Owners paid pursuant to the invalid assessment as follows: $515,792 to the Owner Declarant; $291,972 to CAA; and $279,701 to Hospitality, plus interest from the date of our judgment. We further reverse and remand to the trial court (1) UP Austin's request for appointment

43

of a receiver under section 11.404, (2) UP Austin's and the Owners' claims for attorney's fees, and

(3) the award of conditional post-judgment and appellate attorney's fees to UP Austin.

_____

J. Woodfin Jones, Chief Justice

Before Chief Justice Jones, Justices Pemberton and Rose

Affirmed in part; Reversed and Rendered in part; Reversed and Remanded in part

Filed:   December 8, 2014